**Z. & F. ASSETS REALIZATION CORPO-
RATION et al. v. HULL, Secretary of
State, (LEHIGH VALLEY R. CO. et al.,
Interveners).**

No. 7596.

United States Court of Appeals for the

District of Columbia.

Decided June 3, 1940.

Writ of Certiorari Granted Oct. 14, 1940.

See 61 S.Ct. 51, 85 L.Ed. ——.

Fred K. Nielsen and Frank Roberson, both of Washington, D. C., and Joseph M. Proskauer, of New York City, pro hac vice, by special leave of Court, (John Bassett Moore, of New York City, on the brief), for appellants.

Francis M. Shea, Francis J. McNamara, and Frank C. Sterck, all of Washington, D. C., for appellees.

Richard H. Wilmer and Douglas L. Hatch, both of Washington, D. C., and William D. Mitchell, of New York City, for intervener.

Before MILLER, VINSON and RUTLEDGE, Associate Justices.

MILLER, Associate Justice.

The war between the United States and Germany was ended by a Joint Resolution of Congress on July 2, 1921;[1] which reserved to the United States and to its nationals all rights, privileges, indemnities, reparations, and advantages to which they became entitled by the Treaty of Versailles.[2] The resolution specified that all property of the Imperial German Government, or its successor, and of all German nationals, which was under the control of the United States, should be retained

[1] 42 Stat. 105.
[2] Signed at Versailles June 28, 1919, and effective January 10, 1920. Sen.Doc. No. 348, 67th Cong., 4th Sess. (1923) 3329.

by the latter until suitable provision had been made for the satisfaction of all claims of United States citizens against Germany arising out of, or in consequence of, the war, or otherwise. Thereafter, on August 25, 1921, a treaty of peace was entered into, at Berlin, between the United States and Germany,[3] securing to the United States the rights reserved to them in the Joint Resolution of July 2d, including all rights and advantages stipulated for the benefit of the United States in the Treaty of Versailles. This treaty was proclaimed by the President on November 14, 1921.[4] On August 10, 1922, an executive agreement was signed at Berlin,[5] which provided for the creation of a Mixed Commission[6] "to Determine the Amount to be Paid by Germany in Satisfaction of Germany's Financial Obligations Under the Treaty" of August 25, 1921. The executive agreement provides for a commission of three members, one commissioner to be appointed by each of the two governments, and an umpire to be selected by agreement of the two governments, who is charged with the duty of deciding "upon any cases concerning which the commissioners may disagree, or upon any points of difference that may arise in the course of their proceedings." The executive agreement provides further, in Article II, that in case the umpire or any of the commissioners shall die or retire, or be unable for any reason to discharge his duties, the same procedure shall be followed in filling the vacancy "as was followed in appointing him;" in Article IV, that the Commission may appoint and employ other necessary officers; that the commissioners shall keep minutes of their proceedings and an accurate record of the questions and cases submitted to them; in Article VI, that "The two Governments may designate agents and counsel who may present oral or written arguments to the commission;" that the Commission shall receive and consider all written statements or documents which may be presented to it by or on behalf of the respective governments in support of or in answer to any claim; and that "The decisions of the commission and those of the umpire (in case there may be any) shall be accepted as final and binding upon the two Governments."

On March 10, 1928, Congress enacted the Settlement of War Claims Act,[7] which directed the Secretary of State to certify the awards of the Mixed Claims Commission to the Secretary of the Treasury, who, in turn, was required to pay the awards so certified, according to specified priorities, out of a German special deposit account thereby created.[7a]

Pursuant to the executive agreement, the Commission was created, and an American Commissioner, a German Commissioner, and an Umpire were appointed. In 1927, there were filed with the Commission, by the agent for the United States, claims arising out of the destruction of property by reason of explosions, in 1916, at Black Tom, in New York Harbor, and at Kingsland, New Jersey, in 1917. On October 16, 1930, the Commission found that Germany was not responsible for the explosions and refused to allow the claims.

Petitions for rehearing of the Commission's order dismissing the claims were denied on March 30, 1931. On July 1st of that year a supplemental petition in the two cases was filed, together with new evidence; this was dismissed on December 3, 1932. A new petition was filed on May 4, 1933, to reopen the cases, for the reason, then for the first time alleged, that the decisions of 1930 and 1932 had been obtained by fraud and collusion. Conflicting opinions were expressed by the two

---

[3] U. S. Treaty Ser. No. 658; 42 Stat. 1939; Sen.Doc. No. 348, 67th Cong., 4th Sess. (1923) 2596.

[4] 42 Stat. 1939; Sen.Doc. No. 348, 67th Cong., 4th Sess. (1923) 2600.

[5] U. S. Treaty Ser. No. 665; 42 Stat. 2200; Sen.Doc. No. 348, 67th Cong., 4th Sess. (1923) 2601.

[6] "Article I. The commission shall pass upon the following categories of claims which are more particularly defined in the treaty of August 25, 1921, and in the treaty of Versailles: (1) Claims of American citizens, arising since July 31, 1914, in respect of damage to or seizure of, their property, rights, and interests, including any company or association in which they are interested, within German territory as it existed on August 1, 1914; (2) Other claims for loss or damage to which the United States or its nationals have been subjected with respect to injuries to persons or to property, rights, and interests, including any company or association in which American nationals are interested, since July 31, 1914, as a consequence of the war; (3) Debts owing to American citizens by the German Government or by German nationals."

[7] 45 Stat. 254.

[7a] Sections 2(a) (b), 4.

commissioners as to the power of the Commission to entertain and consider petitions for rehearings. On December 15, 1933, the Umpire, Justice Owen D. Roberts, held that it had power to reopen the cases and either confirm the decisions theretofore made, or alter them as justice and right might require. Following that decision additional evidence was filed by the agents of both governments and argument was had before the Commission upon the question of the power of the Commission. On June 3, 1936, the Commission unanimously set aside its decision of December 3, 1932.

After an interval of a year, occasioned by Germany's request for postponement, witnesses were examined; additional evidence was filed by the agents of both governments; and, in January 1939, the cases were again argued at length before the full Commission. The American agent again requested that the cases be reopened and that the Commission render a final decision on the merits in favor of the United States. On January 27th, the hearings and arguments being concluded, the Commission took the case under advisement. In the deliberations of the Commission which followed, the Umpire and the American Commissioner each expressed the view that the Commission's decision of October 16, 1930, had been induced by fraud in the evidence presented by Germany. Thereupon, at the specific request of the German Commissioner, the Commission proceeded to determine whether, upon the whole record, there was sufficient proof of Germany's responsibility to justify setting aside the prior decision. On March 1, 1939, and during the course of the Commission's deliberation upon that question, the German Commissioner *retired* as a member of the Commission.

Thereafter, personal notice was given to the German agent of a further meeting of the Commission to be held on June 15, 1939. Following this notice, and prior to the date of the meeting, Germany stated, through announcements made both by its agent and its diplomatic representative, that it would ignore the meeting called. These representations and announcements were made a part of the record. On the day of the meeting, the Commission rendered a decision, setting aside its earlier decision of October 16, 1930, and reopening the cases. The American agent again moved that awards be granted in favor

of the United States. The motion was granted and the Commission found that the liability of Germany, in both the Black Tom and Kingsland cases, had been established. It was ordered that awards be prepared and submitted to the Commission for its consideration at a further meeting to be held on notice.

Prior to October 30, 1939, personal notice was given to the German agent of a meeting of the Commission to be held on that date. At that time a thorough study was made by the Commission—absent the German Commissioner—of the records and proofs on file, and awards were made in favor of the United States in each of the 153 claims which are involved in this case.

Appellants, who were plaintiff and intervener-plaintiff in the court below, are beneficiaries under prior awards made by the Commission. They sought identical relief, i. e., for a judgment declaring:

(a) That the decision of the Mixed Claims Commission of October 16, 1930, is final and binding and that all proceedings purported to be had by said Commission or the aforesaid alleged Commission thereafter are null and void;

(b) That the said awards granted to the said Lehigh Valley Railroad Company, Agency of Canadian Car & Foundry Company, Limited, Bethlehem Steel Company, and others, be declared null and void;

(c) That the defendant, Cordell Hull, Secretary of State of the United States, be enjoined and restrained from certifying to the Secretary of the Treasury any and all alleged awards to claimants, Lehigh Valley Railroad Company, Agency of Canadian Car & Foundry Company, Limited, Bethlehem Steel Company, and others;

(d) That the Secretary of the Treasury be restrained and enjoined from paying the amount of any awards to the said claimants, Lehigh Valley Railroad Company, Agency of Canadian Car & Foundry Company, Limited, Bethlehem Steel Company, and others;

(e) That the said Cordell Hull and the said Henry Morgenthau be restrained therefrom during the pendency of this action.

(f) That the Secretary of the Treasury be directed to pay to the plaintiff and other holders of awards of the Mixed Claims Commission, other than the said sabotage claimants, the balance remaining in the German Special Deposit Account to the

extent provided for in the Settlement of War Claims Act of 1928.

(g) That the plaintiff be awarded the costs and disbursements of this action and such other and further relief in the premises as to the Court may seem proper.

The appellees, Hull and Morgenthau, moved to dismiss both the complaint and the bill of intervention upon the grounds that the lower court was without jurisdiction to review the action of the Mixed Claims Commission; to determine whether or not the Commission had jurisdiction to enter the awards of October 30, 1939; or to restrain and enjoin appellees Hull and Morgenthau from certifying and paying such awards. Appellee Lehigh Valley Railroad Company filed an answer, and also filed a motion for summary judgment dismissing the complaint and the bill of intervention. The court granted both the motion to dismiss the complaint, and the motion for summary judgment, and on January 6, 1940, entered judgment thereon. This appeal is from the order and judgment.[8]

Appellants contend here, as they contended below, that (1) the Mixed Claims Commission was without jurisdiction to make the awards of October 30, 1939; (2) if payment is made, by the Secretary of the Treasury, of the amounts specified in the awards of October 30, 1939, it will exhaust the Special Deposit Fund, which is held by the Secretary of the Treasury for the payment of awards made by the Mixed Claims Commission;[9] and (3) thus they will be prevented from receiving payment of amounts to which they are entitled under the prior awards.

Whatever may be the merits of the second and third contentions, the lower court was barred from giving consideration to them; for they, in turn, depend upon the first contention and, as it involves a political and not a judicial question, the court was without jurisdiction to hear or decide it.[10]

It would be difficult to draw a clear line of demarcation between political and non-political questions,[11] and it is unnecessary to do so for the purposes of this decision. In Sevilla v. Elizalde,[12] Justice Stephens, speaking for this court, has recently discussed the general criteria which determine whether or not a case presents a political or judicial question. Among the questions which have been recognized as political rather than judicial in nature, none comes more clearly within the former classification than those which involve the propriety of acts done in the conduct of the foreign relations of our government.[13] As the decision of international questions may involve the friendly relations of nations, they must be dealt with by those departments which have the power to adjust them by negotiation, and, if necessary,

---

[8] Appellee Lehigh Valley Railroad Company also filed a cross-claim against appellee Morgenthau. This was not considered by the court below and is still pending there.

[9] 45 Stat. 254, 260.

[10] See generally, Field, The Doctrine of Political Questions in the Federal Court, 8 Minn.L.Rev. 485; Finkelstein, Judicial Self-Limitation, 37 Harv.L.Rev. 338; Weston, Political Questions, 38 Harv.L.Rev. 296, 299: "A 'political' question, accordingly, will be one which is by law for the determination of the executive or legislative departments, or possibly of the people themselves."

[11] Weston, Political Questions, 38 Harv. L.Rev. 296, 300: "To mention and contrast judicial action and political action, for example, raises at once a fairly definite notion of the essentials of either viewed in the abstract; and yet this becomes a troublesome affair when exact definition is attempted, and still more troublesome when an endeavor is made to allot powers to the departments of government solely as a matter of deduction from such definitions."

[12] App.D.C., 112 F.2d 29, decided April 15, 1940.

[13] In Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726, it was held that "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." See also, Wilson v. Shaw, 204 U.S. 24, 32, 27 S.Ct. 233, 51 L.Ed. 351; Lehigh Valley R. R. v. Russia, 2 Cir., 21 F.2d 396, 399, 400, certiorari denied, 275 U.S. 571, 48 S.Ct. 159, 72 L.Ed. 432; Jaffe, Judicial Aspects of Foreign Relations (1933) 38; Finkelstein, Judicial Self-Limitation, 37 Harv.L.Rev. 338, 347: "Perhaps the only class of cases which courts have unanimously agreed to refrain from interfering with, is that great group of matters involving foreign relations of the United States with other nations."

to enforce the rights involved by other forms or devices of diplomacy. It has been the policy of the judiciary to follow the action of the political departments on such matters and to disclaim power to interfere.[14] As "The judiciary is not that department of the government, to which the assertion of its interests against foreign powers is confided",[15] it follows that the courts should do no act which, directly or indirectly, would embarrass the government in conducting its international affairs.[16] "If this were not the rule, cases might often arise in which, on the most

[14] United States v. Lee, 106 U.S. 196, 209, 1 S.Ct. 240, 27 L.Ed. 171. Courts will not inquire into the power of a foreign government to enter into a treaty with the United States, the determination of the political branch being conclusive. Doe ex dem. Clark v. Braden, 16 How. 635, 14 L.Ed. 1090. The same judicial limitation was applied to an attack upon an Indian treaty. Fellows v. Blacksmith, 19 How. 366, 372, 15 L.Ed. 684. Whether a foreign state has power to carry out its treaty obligations is, likewise, political. Terlinden v. Ames, 184 U.S. 270, 288, 22 S.Ct. 484, 46 L.Ed. 534.

[15] Marshall, Ch. J., in Foster v. Neilson, 2 Pet. 253, 307, 7 L.Ed. 415; Jaffe, Judicial Aspects of Foreign Relations (1933) 51: "It is the general rule that courts will not decide cases against foreign states or sovereigns without their consent, and that in addition certain property, persons, and acts appertaining to sovereign states are withdrawn from the jurisdiction of the courts. This does not mean that a foreign state can commit no wrong, but that the controversy is more properly settled by diplomacy, or international courts or war."

"The President of the United States is intrusted with the right of conducting all negotiations with foreign governments and is the judge of the expediency of instituting, conducting, or terminating such negotiations in respect to claims against foreign governments." Russia v. National City Bank of New York, 2 Cir., 69 F.2d 44, 48. See United States ex rel. Holzendorf v. Hay, 20 App.D.C. 576, writ of error dismissed, 194 U.S. 373, 24 S.Ct. 681, 48 L.Ed. 1025. This was established at an early date in our constitutional history. In 1800, Marshall, addressing the House of Representatives, said: "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." 10 Annals of Congress, 6th Cong., 1st sess. col. 613. In 1803, as Chief Justice of the United States, he said: "By the constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders. In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political: they respect the nation, not individual rights, and, being entrusted to the executive, the decision of the executive is conclusive. The application of this remark will be perceived, by adverting to the act of congress for establishing the department of foreign affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the president: he is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts." Marbury v. Madison, 1 Cranch 137, 165, 2 L.Ed. 60. See United States ex rel. Holzendorf v. Hay, supra, 20 App.D.C. at page 580.

In 1816, the Senate Committee on Foreign Relations reported: "The President is the constitutional representative of the United States with regard to foreign nations. He manages our concerns with foreign nations and must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospects of success. For his conduct he is responsible to the Constitution." Sen.Doc. No. 231, 56th Cong., 2d Sess. (1901) 24. And even though the Senate must ratify treaties in the field of negotiation that body cannot intrude, and Congress itself is powerless to invade it. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319, 57 S.Ct. 216, 81 L.Ed. 255.

[16] Deutsche Bank und Disconto-Gesellschaft v. Cummings, 65 App.D.C. 297, 305, 83 F.2d 554, 562, rev'd on other grounds, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545. See Potter, The "Political Question" in International Law in the Courts of the United States, 8 S.W.Pol. & Soc.Sci.Q. 127; United States v. Lee, 106 U.S. 196, 209, 1 S.Ct. 240, 251, 27 L.Ed. 171: "In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction"; George

important questions of foreign jurisdiction, there would be an irreconcilable difference between the executive and judicial departments. By one of these departments, a foreign island or country might be considered as at peace with the United States; whilst the other would consider it in a state of war. No well-regulated government has ever sanctioned a principle so unwise, and so destructive of national character."[17]

Plaintiff-appellant, in attempting to maintain the jurisdiction of this court, and of the lower court, to determine the validity of the awards made by the Commission, relies upon Article III, Section 2, Clause 1 of the Constitution, which provides: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." But this argument fails to take account of the rule just stated, concerning political questions. It is of course elementary that treaties, together with the Constitution and laws made in pursuance thereof, constitute the supreme law of the land.[18] And it is true that the courts, in the exercise of their judicial functions, must interpret and apply such treaties.[19] But it is equally true that the judicial function extends only to justiciable cases and controversies.[20] By giving to the courts "'judicial Power' the Constitution presupposed an historic content for that phrase and relied on assumption by the judiciary of authority only over issues which are appropriate for disposition by judges. * * * Judicial power could come into play only in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies.' It

was not for courts to meddle with matters that required no subtlety to be identified as political issues."[21]

Thus, when the alleged controversies arising out of treaty relationships are political in nature they are not *cases* within the meaning of Article III of the Constitution and, consequently, are not subject to judicial determination. The distinction was clearly stated by the Supreme Court in the Head Money Cases:[22]

A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. An illustration of this character is found in treaties, which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens. The Constitution of the United States places such provisions as these in the same category as other laws of Congress by its declaration that "this Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land." A treaty,

E. Warren Corp. v. United States, 2 Cir., 94 F.2d 597, 599, certiorari denied, 304 U.S. 572, 58 S.Ct. 1041, 82 L.Ed. 1537. .

For a discussion of rationalizations of the "political" question doctrine, see Clulow et al., Constitutional Objections to the Appointment of a Member of a Legislature to Judicial Office, 6 Geo. Wash.L.Rev. 46, at 59 et seq., particularly notes 67-69.

[17] Williams v. Suffolk Ins. Co., 13 Pet. 415, 420, 10 L.Ed. 226.

[18] U.S.Const. Art. VI, cl. 2.

[19] Crandall, Treaties: Their Making and Enforcement (2d Ed. 1916) 160-161:
"Although a treaty is primarily a contract between nations it operates by virtue of Article VI of the Constitution as a municipal law and so far as it prescribes a rule by which rights of individuals under it may be determined the courts look to the treaty as they would to a statute for a rule of decision."

[20] Muskrat v. United States, 219 U.S. 346, 357, 31 S.Ct. 250, 55 L.Ed. 246.

[21] Opinion of Justice Frankfurter in Coleman v. Miller, 307 U.S. 433, 460, 59 S.Ct. 972, 985, 83 L.Ed. 1385, 122 A.L.R. 695.

[22] 112 U.S. 580, 598, 599, 5 S.Ct. 247, 28 L.Ed. 798.

then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.

■ And in Foster v. Neilson,[23] Chief Justice Marshall said: "Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract—when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; * * *."

Since the case of Ware v. Hylton,[24] decided by the Supreme Court in 1796, the courts of this country have uniformly held that it is not for the judiciary to determine whether a treaty has been broken either by the legislature[25] or the executive,[26] and, accordingly, have consistently declined jurisdiction of such matters. As one court said recently: "Obviously, it would not do for the courts to declare that an act is a breach of a treaty and results in this or that remedy. The remedy accorded might not content the foreign power or might bring about a conflict between the executive and judicial branches of our own government."[27]

The situation is the same as it relates to executive agreements.[28] Just as the power of negotiating and executing the provisions of treaties between the United States and foreign countries resides ex-

[23] 2 Pet. 253, 314, 7 L.Ed. 415.

[24] 3 Dall. 199, 260, 1 L.Ed. 568.

[25] Whitney v. Robertson, 124 U.S. 190, 194, 195, 8 S.Ct. 456, 31 L.Ed. 386; Botiller v. Dominguez, 130 U.S. 238, 247, 9 S.Ct. 525, 32 L.Ed. 926, citing The Cherokee Tobacco, 11 Wall. 616, 20 L. Ed. 227, and Taylor v. Morton, Fed.Cas. No. 13,799, 2 Curt.C.C. 454.

[26] George E. Warren Corp. v. United State, 2 Cir., 94 F.2d 597, 599, certiorari denied, 304 U.S. 572, 58 S.Ct. 1041, 82 L.Ed. 1537.

[27] Id. See Charlton v. Kelly, 229 U.S. 447, 474, 33 S.Ct. 945, 57 L.Ed. 1274, 46 L.R.A.,N.S., 397, quoting John Bassett Moore, International Law Digest, Vol. 5, page 566, to the effect that the enforcement of a treaty depends on the honor and the interests of the governments which are parties to it. "If these fail, its infraction becomes the subject of international reclamation and negotiation, which may lead to war to enforce them. With this judicial tribunals have nothing to do."

It is significant that questions arising under treaties and agreements have been submitted, from an early date, to the political branch of the government. Thus, Crandall, in his work on Treaties: Their Making and Enforcement (2d Ed. 1916) 369, 370, cites the following instances: "Under the Articles of Confederation, the Secretary for Foreign Affairs found it advisable to submit questions arising in the construction of treaties to the Congress. Under the Constitution, the Senate, a co-ordinate branch of the treaty-making power, has been consulted by the President upon such questions only in exceptional in-

stances. On representations by the French government that certain acts of Congress, which imposed extra tonnage dues on foreign vessels and made no exception in favor of French vessels, contravened the fifth article of the treaty of 1778, President Washington submitted the question to the Senate for its consideration. The Senate advised as to the meaning of the article in a resolution. adopted February 26, 1791. The Executive likewise submitted for the consideration of the Senate the question that arose in 1868 between this government and the Ottoman Porte as to the correct version of Article IV of the treaty of May 7, 1830, concerning the territorial exemption to be enjoyed by American citizens in Turkey. Instances are also to be found of the submission by the President to the Senate of awards of international commissions for its advice as to whether the commissioners have acted within their powers, i, e, interpreted correctly the convention under which they were appointed. The award of the commissioners, under the claims convention with Paraguay of February 4, 1859, was, for instance, communicated to the Senate for this purpose by President Buchanan, February 12, 1861. In the case of the recommendatory award of the King of the Netherlands, as arbitrator under the convention with Great Britain of September 29, 1927, for the determination of the northeastern boundary, the Senate, to which the question was submitted by President Jackson, advised that the award was not obligatory; and it was not so considered."

[28] In international law, the term treaty signifies a compact between two or

472

clusively in the political departments of the government, equally so should the power to negotiate and execute such agreements.[29] The purpose of the Treaty of Berlin was that further negotiations should be carried on between the signatories for the determination and settlement of outstanding claims. The executive agreement was in furtherance of this purpose. Under such circumstances there is no reason or excuse for judicial interference. Such interference could result only in embarrassment to the political arm of the government in its conduct of the international affairs of the nation.

▪▪▪ This is none the less true when the treaty or executive agreement provides, as was done in the present case, for a commission to settle the amounts of claims of citizens of the United States against the government of another nation. The compact is between the two governments; the citizens are not parties thereto;[30] and no provision is made or contemplated therein, for submitting any question to the courts. Paraphrasing the language of the Supreme Court in La Abra Silver Mining Co. v. United States,[31] the money in the hands of the Secretary of the Treasury in this case was paid to the United States by Germany subject to the awards of the Commission. That tribunal dealt only with the two governments, had no relations with claimants, and could take cognizance only of claims presented by or through the respective governments. No claimant, individual or corporate, was entitled to present any demand or proofs directly to the Commission. No evidence could be considered except such as was furnished by or on behalf of the respective governments. While the claims of individual citizens presented by their respective governments were to be considered by the Commission in determining amounts, the whole purpose of the agreement was to ascertain how much was due from one government to the other on account of the demands of their respective citizens. Each government, when it entered into the compact under which the awards were made, relied on the honor and good faith of the other for protection, so far as possible, against frauds and impositions by the individual claimants. As between the United States and Germany, indeed as between the United States and American claimants, the money received from Germany was in strict law the property of the United States, and no claimant could assert or enforce any interest in it so long as the government legally withheld it from distribution.[32] And it was expressly agreed that any award made should be, as between the two governments, final and conclusive until set aside by agreement between them.[33]

▪▪▪ Although an individual claimant may have a moral right to participate in an award, as a matter of strict legal or equitable right he has none, and Congress is under no legal or equitable obligation to pay any claim.[34] Therefore, it is only

more independent nations with a view to the public welfare. Dickinson, The Law of Nations (1st Ed. 1929) 1016, quoting 1 Oppenheim, International Law (3d Ed. 1920) § 508 and Hall, International Law (8th Ed. 1924) 384. See Moore, Treaties and Executive Agreements, 20 Pol.Sci.Q. 385. Compacts which have for their object temporary matters and which have been called agreements, conventions, pactions, protocol, modus vivendi, are essentially international treaties. See United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134; B. Altman & Co. v. United States, 224 U.S. 583, 600, 32 S.Ct. 593, 56 L.Ed. 894; Holmes v. Jennison, 14 Pet. 540, 572, 10 L. Ed. 579, 618. See also, Miller, Some Legal Aspects of the Visit of President Wilson to Paris, 36 Harv.L.Rev. 51, 63; Barnett, International Agreements Without the Advice and Consent of the Senate, 15 Yale L.J. 18, 63.

29 See United States v. Belmont, 301 U.S. 324, 330, 57 S.Ct. 758, 81 L.Ed. 1134.

30 Frelinghuysen v. Key, 110 U.S. 63, 71, 72, 3 S.Ct. 462, 28 L.Ed. 71; La Abra Silver Mining Co. v. United States, 175 U.S. 423, 458, 20 S.Ct. 168, 44 L.Ed. 223; United States v. Diekelman, 92 U.S. 520, 524, 23 L.Ed. 742; Wulfsohn v. Russian Socialist Federated Soviet Republic, 234 N.Y. 372, 376, 138 N.E. 24, 26. See United States ex rel. Holzendorf v. Hay, 20 App.D.C. 576, 580, writ of error dismissed, 194 U.S. 373, 24 S.Ct. 681, 48 L.Ed. 1025: "The duty of righting the wrong that may be done to our citizens in foreign lands is a political one, and appertains to the executive * * *."

31 175 U.S. 423, 458, 20 S.Ct. 168, 44 L.Ed. 223.

32 La Abra Silver Mining Co. v. United States, 175 U.S. 423, 458, 20 S.Ct. 168, 44 L.Ed. 223.

33 Frelinghuysen v. Key, 110 U.S. 63, 72, 3 S.Ct. 462, 28 L.Ed. 71.

34 Williams v. Heard, 140 U.S. 529, 537, 11 S.Ct. 885, 35 L.Ed. 550; United States ex rel. Boynton v. Blaine, 139 U.S. 306,

when such a claimant has been permitted by Congress to participate in such an award that he has any standing to invoke judicial relief. Then, and only then, may he invoke the jurisdiction of the court to determine questions involving ownership, or apportionment between claimants of the amounts awarded.[35] Mellon v. Orinoco Iron Co.,[36] relied upon by appellants, is distinguishable on this ground. The sole issue in that case was the ownership of a specific fund received by the United States from Venezuela.[37] The validity of the award was not challenged. Obviously, a judicial determination of ownership or apportionment of the amount of an award must proceed upon the assumption that the award is valid. This being true, in such a case the international aspects of the dispute, which preceded the making of the award, are no longer involved; the controversy of which the court takes jurisdiction is a domestic one; consequently, there is—to the extent of the award—no longer a question in which a foreign government can have a legitimate interest; a fortiori there is no longer a political question; and no longer any obstacle to judicial action on that ground.

The present case, clearly, is not one of a domestic, non-political character. Appellants challenge the power and authority of the international Commission, attack the validity of its awards and seek to deny them effect. This is clearly revealed by the allegations of the complaint, as well as by the prayers for relief. While in paragraphs 8 and 9 it is alleged that "the said Commission thereupon duly granted five awards in favor of the said plaintiff," and, further, that other "numerous claimants * * * were duly granted awards by the said Commission * * *;" the rest of the complaint (paragraphs 11 to 31, inclusive) is devoted to challenging the existence, authority and actions of the Commission, the validity of the later awards, and the legality of the procedure which was followed.

In fact, the situation of the present case is clearly one of a continuing controversy between the United States and Germany although, paradoxically, neither government is a party to the present suit. Germany bound herself to pay to the United States, in full, awards made by the Mixed Claims Commission here involved. The fund established in the Treasury, and which is sought to be controlled in the present case, was set up for the purpose of paying awards thereafter to be made. To it Germany made substantial contributions. Into it were deposited amounts seized from German nationals, as well as property belonging to the German Government. If the amount of the fund shall be found insufficient to pay all awards, the German Government is solemnly bound to supply additional funds necessary for that purpose, and has provided bonds to guarantee such payment. In consideration of Germany's obligation above recited, the United States returned to German nationals eighty per cent of the funds and property seized by the government and originally held for the purpose of satisfying these claims.

The continuing interest of Germany in the controversy cannot well be denied. (1) If appellants are correct in their contention that the retirement of the German Commissioner blocked further action by the Mixed Claims Commission,[38] then—as to all undecided matters—presumably the two countries were right back where they were before the Commission was appointed. (2) If appellants' contention is correct that awards were improperly made then perhaps Germany was not liable for the amount thereof, while if they were properly made presumably she was liable. (3) If it is true, as appellants contend, that the Commission acted outside the scope of its authority then perhaps it acted in an area which the executive agreement did not cover; hence, in an area coverable only by a treaty negotiated, or to be negotiated, by the political departments of the government.

If there were any doubt as to the con-

323, 11 S.Ct. 607, 35 L.Ed. 183. See United States v. Weld, 127 U.S. 51, 55-57, 8 S.Ct. 1000, 32 L.Ed. 62.

35 Cf. Comegys v. Vasse, 1 Pet. 193, 212, 7 L.Ed. 108; Judson v. Corcoran, 17 How. 612, 15 L.Ed. 231; Frevall v. Bache, 14 Pet. 95, 10 L.Ed. 369. Cf. also, Williams v. Heard, 140 U.S. 529, 539, 11 S.Ct. 885, 35 L.Ed. 550.

36 266 U.S. 121, 45 S.Ct. 53, 69 L.Ed. 199.

37 See Smith v. Harrah, 60 App.D.C. 258, 51 F.2d 314.

38 Cf. Republic of Colombia v. Cauca Co., 190 U.S. 524, 528, 23 S.Ct. 704, 47 L.Ed. 1159.

tinuing interest of Germany in the proceedings, or of the political nature of the controversy, it would be dispelled by a reading of the acrimonious protest which was filed following the retirement of the German Commissioner, by the German Chargé d' Affaires ad interim, with the Secretary of State. This protest spoke disparagingly of the American Umpire; referred to the Mixed Claims Commission as "the rump Commission;" claimed that it "was incompetent to make a decision;" that any awards made by it were void; referred to the proceedings of the Commission as "a litigation between two sovereign Governments, in which the uninvestigated claims amount to approximately $40,-000,000!;" stated that the "approval of claims of *Canadian* interested parties in a procedure which the German Government and the United States Government have established for the settlement of claims of *American* citizens is null and void;" and "To sum up * * * that the 'decision' of the American Umpire, which contemplates the issuance of awards, was issued in disregard and violation of essential provisions of the statute of the Commission, essential agreements between the German Government and the United States Government, essential rules of procedure and binding decisions of the full Commission, the observance of which would have been the absolute duty of the American Umpire." The communication concluded with the expression of hope "that the United States Government does not approve of the violations of procedure discussed in this note and that it will find some way of quashing them, in order to restore, in collaboration with the German Government, the basis existing before the beginning of these violations of procedure, upon which the proceedings can be brought to a conclusion in an orderly way."

To these protests and accusations the Secretary of State replied: "I have entire confidence in the ability and integrity of the Umpire and the Commissioner appointed by the United States despite your severe and, I believe, entirely unwarranted criticisms, and I am constrained to invite your attention to the fact that the remarkable action of the Commissioner appointed by Germany was apparently designed to frustrate or postpone indefinitely the work of the Commission at a time when, after years of labor on the particular cases involved, it was expected that its functions would be brought to a conclusion." It requires no more than a recital of these exchanges between the governments of Germany and the United States to show that they bring the case clearly within the realm of political as distinguished from judicial questions.

The present case is clearly distinguishable, also, from the case of Republic of Colombia v. Cauca Co.,[39] relied upon by appellants, in which a foreign government voluntarily submitted to an arbitration between itself and a private citizen of the United States and, thereafter, voluntarily submitted itself to the jurisdiction of a federal court to secure the determination of a controversy between itself and that private citizen, which arose out of the arbitration proceeding.[40]

In view of our determination, as set forth above, it is not necessary to consider any of the other assignments or questions presented.

Affirmed.

---

[39] 190 U.S. 524, 23 S.Ct. 704, 47 L.Ed. 1159.

[40] Cf. United States v. Diekelman, 92 U.S. 520, 524, 23 L.Ed. 742.