Eben HOPSON, Sr., et al.,
Plaintiffs-Appellants,

v.

Juanita KREPS et al.,
Defendants-Appellees.

No. 79–4151.

United States Court of Appeals,
Ninth Circuit.

July 14, 1980.

---

Wickwire, Lewis, Goldmark, Dystel & Schorr, Seattle, Wash., on brief; Charles A. Goldmark, Seattle, Wash., for plaintiffs-appellants.

Bruce C. Rashkow, Dept. of Justice, Washington, D.C., on brief; Margaret Strand, U.S. Atty., Alaska, for defendants-appellees.

Before WALLACE and FARRIS, Circuit Judges, and EAST,* District Judge.

WALLACE, Circuit Judge:

This case presents difficult questions of statutory interpretation, justiciability, and the scope of judicial review of administrative action in foreign affairs. Hopson brought this action against the United States, the Secretary of Commerce and other government personnel and agencies (government) to challenge the validity of Department of Commerce regulations adopted pursuant to the International Whaling Convention Act of 1949. 16 U.S.C. §§ 916–916*l*. The district court dismissed the action as presenting a non-justiciable political question. *Hopson v. Kreps*, 462 F.Supp. 1374 (D.Alaska 1979). Because we find that the district court had jurisdiction to consider Hopson's statutory claim, we reverse and remand.

## I.

The 1946 International Whaling Convention (Convention), 62 Stat. 1716, was entered into for the purpose of strengthening efforts to conserve whale populations around the world. Since prior treaties could only be amended by formal protocol, and therefore did not lend themselves to establishment of seasonal quotas for the taking of whales, a major purpose of the Convention was the creation of an international commission with power to fix such quotas. *See Hopson v. Kreps, supra*, 462 F.Supp. at 1375. The Convention thus empowered an International Whaling Commission (Commission) to establish a detailed set of whaling regulations and quotas, called a Schedule, which may be amended by a vote of three-fourths of the members of the Commission. The Commission consists of a representative from each "Contracting Nation." Although the Commission has authority to amend the Schedule of regulations pursuant to Article V of the Convention, it has no authority to amend the Convention itself.

The subject of this controversy, the bowhead whale, is one of the most endangered whale species. Since 1946, the bowhead has been completely protected under the Schedule, except for an exemption for native subsistence whaling. This controversy began in 1977 when the Commission voted 17–0, the United States abstaining, to elimi-

---

* Honorable William G. East, United States District Judge, District of Oregon, sitting by designation.

nate the native subsistence exemption. The policy dilemma for the United States stems from the fact that native hunting for the bowhead whale is considered to be an integral part of Eskimo life and culture. Indeed, the bowhead whale is viewed as vital to Eskimo nutrition, apart from its contribution to traditional living patterns. Largely for these reasons, the government prepared an extensive environmental impact statement to determine whether the United States should file an objection to the Schedule amendment.

Pursuant to Article V of the Convention, if a Contracting Government objects to an amendment to the Schedule within 90 days, the amendment does not apply to the objecting nation. Although the United States decided not to object to the native subsistence whaling amendment, the government made it clear that it considered a total ban on subsistence whaling unacceptable. Since that time, the American delegation to the Commission has succeeded in obtaining a limited quota for the taking of bowhead whales by Alaskan natives.

Hopson brought this action on behalf of Alaskan Eskimos, claiming that the Commission exceeded its jurisdiction under the Convention when it eliminated the exemption for subsistence whaling. Jurisdictional language in Article I of the Convention states that the Convention applies to "factory ships, land stations, and whale catchers under the jurisdiction of the Contracting Governments . . . ." 62 Stat. at 1717. Article II defines "whale catcher" as "a ship used for the purpose of hunting, taking, towing, holding on to, or scouting for whales." *Id.* Hopson contends that this definition was intended to apply only to commercial whaling vessels and not to the small boats used by Eskimos.

More important for our purposes, Hopson contends that since Congress enacted the Whaling Convention Act of 1949 solely to implement the Convention, the Commerce Department was not authorized to adopt Commission regulations that exceed the scope of the Commission's jurisdiction.[1] The district court refused to address Hopson's statutory argument, however, and accepted instead the government's contention that the interpretation of the Convention "is so intertwined with foreign policy considerations that [a] court has no jurisdiction to consider the validity of the [Commerce Department] regulations that implement the Commission's Schedule." 462 F.Supp. at 1378. In reaching this conclusion, the court relied heavily on affidavits submitted by the government tending to show that the nation's efforts to develop international conservation would be damaged by a ruling adverse to the government. The government also contends before us that the decision of the executive not to object to the amendment of the Schedule constituted an exercise of unreviewable administrative discretion. We will consider first the district court's conclusion that it lacked jurisdiction to determine the validity of the challenged regulations, after which we will consider the reviewability of the administrative action.

## II.

The district court's decision was rendered prior to our decision in *United States v. Decker*, 600 F.2d 733 (9th Cir.), *cert. denied*, 444 U.S. 855, 100 S.Ct. 113, 62 L.Ed.2d 73 (1979), which raised a similar issue. In *Decker*, criminal defendants appealed their convictions pursuant to a statute prohibiting violation of the treaty regulations of an international commission, contending that the convictions were outside statutory language limiting the scope of criminal liability. Specifically, the defendants contended that the Secretary of State lacked authority

---

1. Hopson also contends that the Commerce Department issued its regulations in violation of the procedural and substantive requirements of the Marine Mammal Protection Act and the Endangered Species Act. *See* 16 U.S.C. §§ 1371(b) and 1539(e)(4). In addition, he claims that the regulations violate United States trust responsibilities to native subsistence whalers. We need not address these additional contentions.

pursuant to a 1937 treaty to accept partially the regulations of the international commission, and that the Secretary's action thus constituted a rejection of the regulations. *Id.* at 738. We held that the issue whether the regulations were validly accepted, and therefore applicable under the statute, was not rendered political merely because deciding it would require the interpretation of a treaty or have potential impact on the nation's external relations. Since *Decker* involved an appeal from a criminal conviction for violation of the statute, we also stated that we would be particularly reluctant to withhold review where the validity of the regulations under the statute went to the validity of the criminal conviction we were charged to review. *Id.*

The government has failed to distinguish this case from *Decker.* The government urges that the political question doctrine has prudential as well as Article III dimensions, and contends that its application involves a weighing of relevant considerations on a case-by-case basis. It asks us to sustain the decision of the district court on the basis of a finding that the court sensitively applied the well-known criteria enunciated in *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), to the particular facts before us.[2] We need not resolve the longstanding debate as to the nature and proper scope of the political question doctrine,[3] however, to conclude that we are bound by our specific holding in *Decker* rather than the general formulation of *Baker.*

The analysis in *Baker* makes it clear that the criteria enunciated there generally do not apply to claims that the executive has exceeded specific limitations on delegated authority. *Id.* at 217, 82 S.Ct. at 710.[4] Moreover, in analyzing the Supreme Court's foreign affairs cases, *Baker* stated that the Court's decisions had reflected

> a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.

*Id.* at 211–12, 82 S.Ct. at 707. The government misconstrues the content of this statement when it asserts that we should defer to the government because of the history of the executive branch's management of the

---

**2.** The *Baker* formulation reads:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. at 710.

**3.** It is difficult to reconcile the cases refusing to decide various issues, including those in the field of foreign relations, without acknowledging that the doctrine reflects prudential and functional concerns as well as Article III limitations on the use of judicial power. *See* L. Tribe, American Constitutional Law § 3–16, at 71–79; Scharpf, *Judicial Review and the Political Question: A Functional Analysis*, 75 Yale L.J. 517, 535–36 (1966); Note, *A Dialogue on the Political Question Doctrine*, 1978 Utah L.Rev. 523. *But see* Henkin, *Is There a "Political Question" Doctrine?*, 85 Yale L.J. 597 (1976) ("political question" rulings in foreign affairs are rulings on the merits); Tiger, *Judicial Power, the "Political Question Doctrine," and Foreign Relations*, 17 U.C.L.A. L.Rev. 1135 (1970) (same).

**4.** Claims that the executive has violated constitutional or statutory limitations have been ruled political only very rarely in recent years. *See, e. g., Sarnoff v. Connally*, 457 F.2d 809 (9th Cir.), *cert. denied*, 409 U.S. 929, 93 S.Ct. 227, 34 L.Ed.2d 186 (1972) (constitutional challenge to executive warmaking); *Atlee v. Laird*, 347 F.Supp. 689 (E.D.Pa.1972), *aff'd*, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973) (same). *See also, Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (plurality opinion) (treaty termination).

bowhead whale issue. The "particular question posed" here is whether the Commerce Department exceeded limits on its statutory authority in promulgating these regulations. Questions of statutory authority are clearly susceptible of judicial handling and involve the classic judicial function of construing statutes to determine whether agencies have acted outside their jurisdiction. *See* K. Davis, Administrative Law § 28.21 (Supp.1970), at 993–94. Similarly, to the extent that Hopson's claim raises issues that go to the statutory authority of the Commerce Department, those claims cannot be subjected to the government's characterization that they represent nothing more than an attack on the nation's international conservation policy.

Apart from these consideration, it is clear that in *Decker* we were cognizant of the *Baker* criteria when we determined that the issue there was justiciable. 600 F.2d at 737. We cannot say that similar issues are rendered non-justiciable merely by independently applying the *Baker* criteria and finding them applicable on these facts.

The government next contends that this case is governed by our decision in *Jensen v. National Marine Fisheries Service*, 512 F.2d 1189 (9th Cir. 1975), rather than *Decker*. Our disagreement with this contention should not be surprising in light of our refusal in *Decker* to follow the district judge in this case. We expressly disagreed with his reliance on *Jensen*. *United State. v. Decker, supra*, 600 F.2d at 738 n.8.

In *Jensen*, we held non-justiciable a claim that the Secretary of State had acted arbitrarily (and hence illegally) in accepting the regulation of an international commission enacted pursuant to a treaty similar to the one before us here. In *Decker*, we distinguished *Jensen* in two ways. First, we found that while *Jensen* involved a refusal

to review a decision made within the range of a broad grant of discretionary authority in foreign affairs, the claim in *Decker* went to the very existence of the power of the executive to act as it did. *United States v. Decker, supra*, 600 F.2d at 737. Second, we observed that whereas in *Jensen* we denied plaintiff's request for "declaratory and injunctive relief from the adverse economic effects of the challenged regulations," a political question holding in *Decker* "would prevent us from reviewing the propriety of appellants' convictions and prison sentences." *Id.* at 738.

The government relies on the second point, contending that *Decker* draws a distinction for purposes of justiciability analysis between a claim for declaratory relief and an appeal from a criminal conviction. But we do not read *Decker* as holding that justiciability turns on the slender reed that distinguishes the seeking of declaratory relief from the threat of prosecution and appellate review of a criminal conviction. Such a reading would be at odds with consistent holdings of the Supreme Court that persons subject to a real threat of criminal prosecution "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973) (citations omitted); *accord, Craig v. Boren*, 429 U.S. 190, 194–96 & n.5, 97 S.Ct. 451, 455–56, 50 L.Ed.2d 397 (1976); *Lake Carriers Ass'n v. MacMullan*, 406 U.S. 498, 506–08, 92 S.Ct. 1749, 1755–56, 32 L.Ed.2d 257 (1972); *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).[5] Rather, we read *Decker* merely as stressing that the criteria of *Baker v. Carr, supra*, 369 U.S. at 217, 82 S.Ct. at 710, should not be applied indiscriminately and without considering that a refusal to decide, based on one or more of its prudential formulations, could have the effect of allowing

---

**5.** It is true that plaintiffs in *Jensen* also sought relief from potential prosecution, but we held that the mere possibility of prosecution, as presented in that case, did not present a concrete controversy that was ripe for adjudication. 512 F.2d at 1191.

persons to suffer criminal penalties for refusing to obey an invalid regulation.[6]

Finally, the government argues that its position is lent support by *Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979), which was decided since *Decker*. In *Goldwater*, a plurality of the Supreme Court held that Senator Goldwater's claim, that the President lacked authority unilaterally to terminate the United States treaty with Taiwan, presented a political question. It is significant that the opinion did not command the assent of a majority of the Court. More important, even the plurality opinion emphasized that the effects of the challenged executive action were entirely external to the United States, in contrast to the "profound and demonstrable domestic impact" of the executive action challenged in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), which it distinguished. 444 U.S. at 997, 100 S.Ct. at 534. As the implementation of regulations carrying criminal sanctions has a "demonstrable domestic impact," it is clear that *Goldwater* does not affect our analysis in *Decker*.

### III.

The government asks us to affirm the judgment of the district court on the alternative ground that the Secretary of State's decision not to object to the amendment of the Schedule was action which the statute committed to his unreviewable discretion. The government asserts that because such a ruling holds that the statute granted the Secretary authority to determine the validity of the amendment under the Convention, it would have the effect of sustaining the challenged regulations rather than avoiding questions as to their validity. The government argues that this alternative ground can thus be squared with *United States v. Decker, supra*, 600 F.2d 733.

The government is correct in observing that although "[i]t is the role of the judiciary to interpret international treaties and to enforce domestic rights arising from them," *id.* at 737, treaties are relevant to the interpretation of congressional enactments only to the extent that Congress makes them relevant. Courts are empowered to give direct legal effect to treaties only insofar as they are self-executing and therefore operate as the law of the land. *See Head Money Cases*, 112 U.S. 580, 598–99, 5 S.Ct. 247, 253–54, 28 L.Ed. 798 (1884), 5 G. Hackworth, Digest of International Law 177–85 (1943); 14 M. Whiteman, Digest of International Law 302–16 (1970); Comment, *Self-Executing Treaties and Human Rights Provisions of the United Nations Charter: A Separation of Powers Problem*, 25 Buff.L.Rev. 773 (1976). Treaty regulations that penalize individuals, on the other hand, are generally considered to require domestic legislation before they are given any effect. L. Henkin, Foreign Affairs and the Constitution 159 (1972). Moreover, "if a treaty is not self-executing it is not the treaty but the implementing legislation that is effectively 'law of the land.'" *Id.* at 157.

The issue in any legal action concerning a statute implementing a treaty is the intended meaning of the terms of the statute. The treaty has no independent significance in resolving such issues, but is relevant insofar as it may aid in the proper construction of the statute. Thus, where courts have been persuaded as to the proper interpretation of an implementing statute, that judgment has not been affected by the claim that the reading given the statute was inconsistent with the intent of the parties to the treaty. *United States v. Navarre*, 173 U.S. 77, 19 S.Ct. 326, 43 L.Ed. 620 (1899); *Botiller v. Dominguez*, 130 U.S. 238, 9 S.Ct. 525, 32 L.Ed. 926 (1889).

Moreover, although claims alleging that agencies have acted beyond their statutory

---

**6.** We also decline to adopt the view that "personal liberty" interests will more likely trigger judicial review than claims related to "economic interests." If economic penalties had been

the only possible consequences of violation of the regulations in *Decker*, the validity of the regulations would still have been a prerequisite to Decker's liability.

authority are generally deemed justiciable, there is also no doubt that Congress has "the constitutional authority . . . to lodge with the Secretary of State the authority to consider and pass upon the regularity and validity" of the actions of an international commission pursuant to a treaty. *Z. & F. Assets Realization Corp. v. Hull*, 311 U.S. 470, 486, 61 S.Ct. 351, 354, 85 L.Ed. 288 (1941). The government thus contends that *Z. & F. Assets* controls this case. There, award holders under the War Claims Act of 1928 sued to restrain the Secretary of State from certifying later awards to other claimants, arguing that the international commission which issued the awards acted outside its jurisdiction under a 1922 treaty. Specifically, plaintiffs argued that since the statute implementing the treaty called for payment of "awards" of the Commission, Congress intended to limit such payments to "awards rendered conformably to the terms and requirements of the [treaty]." *Id.* 61 S.Ct. at 476, (Argument for Petitioner).

Although the circuit court had held that the claim presented a political question, *Z. & F. Assets Realization Corp. v. Hull*, 114 F.2d 464 (D.C. Cir. 1940), the Supreme Court rested its ruling on another ground. The Court found that the statutory provision conditioning payment of claims on the certification of the Secretary of State had vested unreviewable discretion in the Secretary to determine the validity of the awards. Stating that the issue was one of the intent of Congress as disclosed by the Act, the Court reasoned that "it was natural and appropriate that Congress should entrust to the Secretary of State the decision of questions that might arise with respect to the propriety of the payment of awards made by the Commission . . ." *Id.* at 486–87. The Court relied both on

"[t]he literal and natural import" of the language of the provision and "the nature of the questions presented and their relation to the conduct of foreign affairs within the province of the Secretary of State . . . ." *Id.* at 489. The emphasis placed on the relationship between the grant of power and the conduct of American foreign policy lends support to the view that the nature of the grant of power is an important consideration in resolving issues of reviewability. *See* K. Davis, Administrative Law, *supra*, §§ 28.09, at 45; 28.21 (Supp.1970), at 993; L. Jaffe, Judicial Control of Administrative Act 363, 491–93 (1965).

■ In the case before us, the statute expressly grants the Secretary of State power to accept or object to amendments to the Schedule pursuant to Article V of the Convention. 16 U.S.C. § 916b. The relevant legislative history states that the Secretary "is authorized to act for this Government in connection with amendments to the schedule made by the Commission . . ." H.R.Rep.No. 2514, 81st Cong., 1st Sess. 5 (1949), *reprinted in* [1950] U.S.Code Cong. & Admin.News, pp. 2938, 2943. As the Secretary of Commerce is authorized by the Act "to adopt such regulations as may be necessary to carry out . . . the *regulations of the Commission*," 16 U.S.C. § 916j(a) (emphasis added), it is contended that 916b grants the Secretary of State final authority to determine whether amendments to the schedule will constitute "regulations of the commission" under 916j.[7] The government thus asks us to read this grant of power broadly so as to sustain the discretion of the district court.

We decline the government's invitation. A careful study of the district court's opinion demonstrates that the holding is based upon the political question doctrine. Admittedly, there is some language which refers to commitment to agency discretion, but it would be unfair to the district court

---

7. Without reaching the merits of the government's contention, we observe that the statute before us is not precisely analogous to the statute addressed in *Z. & F. Assets*. Whereas the statute in *Z. & F. Assets* specifically authorized the Secretary of Treasury to pay awards certified by the Secretary of State, here the Secretary of Commerce's alleged power to adopt amendments not objected to by the Secretary of State entails a relatively broad reading of 916b.

to construe these brief references as an unannounced alternative holding. We arrive at this conclusion primarily because the district court's analysis does not appear to have been based on a reading of the statute, and the language referring to discretionary administrative action does not articulate a distinct basis for the court's holding. Although *Z. & F. Assets* indicates that the subject matter of the grant of discretionary power is sometimes a significant factor in reviewability rulings, such rulings ultimately require interpretation of congressional intent. The district court's opinion, however, displays virtually no analysis of the language of the statute or discussion of legislative intent. Thus, the court's statement that the Secretary's action constituted unreviewable administrative action in foreign affairs apparently rested on the court's broad holding that it lacked jurisdiction even to address the validity of the Commerce Department regulations. We have held that this conclusion was error.

It would be inappropriate for us to decide the reviewability issue independently because we believe it should be first decided by the district court after full briefing by the parties.[8] The reviewability issue raises substantial questions as to the proper reconciliation of the holdings in *Decker, Z. & F. Assets*, and *Jensen v. National Marine Fisheries Service, supra*, 512 F.2d 1189. Although *Decker* does not specifically address a reviewability contention,[9] we were willing in that case to look behind the Secretary's decision to accept the treaty regulations of an international commission at least to the extent of determining whether he had "accepted" them in accordance with the terms of the treaty. It will be for the district court initially to determine whether the

holding in *Decker* also applies, under this statutory scheme, to treaty questions going to the validity of the regulations of the international commission, and therefore to the merits of the Secretary's decision whether to accept. We offer no view on the merits of that issue. We hold only that the district court erred in concluding that it lacked jurisdiction to rule on the validity of the Commerce Department regulations under the statute and remand for his consideration of Hopson's claims.

REVERSED AND REMANDED.

---

8. This issue was virtually unexplored before us. Most of the discussion in the briefs and oral arguments in this case were directed at the political question ruling of the district court. Although the government did articulate reviewability as a separate ground for the decision, that ground was not explored at any length. Viewing the district court decision as a political question ruling only, Hopson did not address any separate discussion to a reviewability question. Indeed, at oral argument Hopson stated that reviewability was one of the statutory

questions which the district court refused to decide.

9. In *Decker*, the Secretary's power to accept the regulations of the Commission was granted by the treaty rather than by an explicit statutory provision. The scope of review thus turned entirely on the justiciability of the question of treaty construction presented there. Any implications of this difference in the statutory schemes can be explored by the parties on remand.