Varoujan **DEIRMENJIAN**, Aris Aghvazarian, Robert Dabaghian, Marguerid Jeredjian, Katia Kermoyan, Paylig Kermoyan, and Raffi Bakian, on Behalf of Themselves and All Others Similarly Situated, as Well on Behalf of the General Public and Acting in the Public Interest, Plaintiffs,

v.

**DEUTSCHE BANK, A.G.,** Dresdner Bank, A.G., and Does 1–100, Defendants.

No. CV 06–774 MMM(CWx).

United States District Court,
C.D. California.

Dec. 14, 2007.

**1070**

Brian S. Kabateck, Richard L. Kellner, Kabateck Brown Kellner, Mark J. Geragos, Shelley Kaufman, Geragos & Geragos, Los Angeles, CA, Vartkes Yeghiayan, Yeghiayan & Associates, Glendale, CA, for Plaintiffs.

Andrew Ryhs Davies, Louis B. Kimmelman, Allen and Overy, Jeffrey L. Nagel, Terry Myers, Gibbons, New York City, Haley Melisse McIntosh, Wallace M. Allan, O'Melveny and Myers, Adam Pines, Manatt Phelps & Phillips, Los Angeles, CA, Thomas R. Valen, Gibbons PC, Newark, NJ, for Defendants.

### ORDER GRANTING DEFENDANTS' PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT

MARGARET M. MORROW, District Judge.

On January 12, 2006, Varoujan Deirmenjian and six other plaintiffs commenced this putative class action in Los Angeles Superior Court against Deutsche Bank, A.G., Dresdner Bank, A.G., and certain fictitious defendants (collectively, "defendants" or "German Bank Defendants"). On February 10, 2006, the action was removed to this court.[1]

Plaintiffs bring the action on their own behalf, and on behalf of similarly situated individuals and the general public, to recover money and property purportedly withheld by defendants during the Armenian Genocide.[2] Plaintiffs allege that they are the "rightful heirs" of that money and property and seek recovery of all deposited assets not returned, a full accounting, and disgorgement by the German Bank Defendants of interest and profits derived from the deposited assets. Plaintiffs also seek—on behalf of named plaintiff Raffi Bakian and the putative members of Class B—the return of all looted assets received by the German Bank Defendants.[3] With respect to these assets, they plead state law causes of action for breach of special duty; expropriation and conversion; unjust enrichment; negligence; constructive trust; money had and received; and an accounting.[4] It is these claims to which the current motion is addressed.

On September 11, 2006, the court issued an order granting in part and denying in part defendants' motion to dismiss the

---

1. Notice of Removal under 28 U.S.C. § 1441 (Diversity Jurisdiction). The court accepted a transfer of the case from Judge Stephen V. Wilson, since it is related to a prior action assigned to this court, *Tachjian et al. v. Deutsche Bank et al.*, CV 04–7248 MMM (RCx). Plaintiffs subsequently filed a motion for remand, which was denied on April 27, 2006, after the court concluded that it had jurisdiction to hear the action under the Class Action Fairness Act of 2005, Pub.L. No. 109–2, § 4, 119 Stat. 4 (2005), codified at 42 U.S.C. § 1332(d).

2. Specifically, plaintiffs allege that the German Bank Defendants:

"a. concealed and prevented the recovery of assets which were deposited in accounts with the GERMAN BANK DEFENDANTS by Armenians prior to World War I and the Armenian Genocide; and

b. accepted looted assets forcibly taken by the government of Ottoman Turkey during World War I and the Armenian Genocide." (First Amended Class Action Complaint, ¶ 2.)

3. *Id.*, ¶¶ 3–5.

4. *Id.*, ¶¶ 72–88, 103–125.

complaint. As relevant here, the court granted defendants' motion to dismiss Bakian's claim on behalf of the putative Class B plaintiffs, holding that (1) that under California Code of Civil Procedure § 361, the state's "borrowing statute," [5] California statutes of limitations might apply to the Class B claims if those claims accrued while the Class B plaintiffs were citizens of California,[6] but (2) that even if this were the case, the Class B claims were time-barred under California law, and the complaint contained insufficient allegations to toll the limitations period or estop defendants from asserting the statute of limitations as a defense.[7] The court granted plaintiffs leave to amend to plead facts that would support tolling or estoppel.[8]

On October 16, 2006, plaintiffs filed their first amended class action complaint. On November 28, 2006, defendants filed a motion to dismiss the amended Class B claims, arguing, *inter alia*, (1) that the amended complaint failed to rectify the pleading deficiencies noted by the court in its September 11, 2006 order, and (2) that a recently enacted California statute, which purports to extend the statute of limitations on the claims, and which plaintiffs cite in their complaint, is unconstitutional.

## I. FACTUAL BACKGROUND

### A. General Allegations Underlying the Class B Plaintiffs' Claims

In the late nineteenth and early twentieth centuries, many ethnic Armenians lived in the Ottoman Turkish Empire.[9] Plaintiffs alleges that, in 1910, a regime known as the Young Turks came to power and began to "cleanse" the Empire of all non-Turks, including ethnic Armenians.[10] Initially, this effort purportedly took the form of forced deportations.[11] Plaintiffs assert that, "[w]ith the onset of World War I, [however], the government of the Ottoman Turkish Empire launched a premeditated, systemic campaign to destroy ethnic Armenians through a process of massacre and deportation, which is now recognized as the Armenian Genocide."[12] Between April 1915 and 1923, an estimated 1.5 million to 2 million Armenians were allegedly killed; ninety percent of those deported allegedly perished.[13]

In conjunction with this alleged program of forced relocation and extermination, the Young Turks purportedly transferred Armenian-owned businesses to Turks.[14] In

---

**5.** California's "borrowing statute," CAL.CIV. PROC.CODE § 361, provides:

"When a cause of action has arisen in another State, or in a foreign country, and by the laws thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against him in this State, except in favor of one who has been a citizen of this State, and who has held the cause of action from the time it accrued."

**6.** See Order Granting in Part and Denying in Part Defendants' Motion To Dismiss with Leave To Amend ("Sept. 11 Order") at 58–62.

**7.** *Id.* at 69–77.

**8.** *Id.* at 77–78.

**9.** First Amended Class Action Complaint, ¶ 24.

**10.** *Id.,* ¶ 25.

**11.** *Id.,* ¶ 26.

**12.** *Id.,* ¶ 27. While ostensibly continuing its "deportation and relocation" program, the government issued a secret directive ordering the military to exterminate all males under fifty, soldiers, priests, and teachers of Armenian ethnicity. (*Id.*) Women and children were to be Islamized. (*Id.*)

**13.** *Id.,* ¶ 28.

**14.** *Id.,* ¶ 29.

May 1915, the Young Turks allegedly issued a decree stating that all goods belonging to Armenians were to be considered abandoned property.[15] Commencing January 1, 1916, the Ottoman Empire's Minister of Commerce and Agriculture purportedly sent letters to financial institutions operating within the Empire, advising that the government had established *Tasfiye Commissionou*, or Liquidation Commissions.[16] The financial institutions were directed to transfer all Armenian assets in their possession to the Commissions,[17] which were to inventory the property—including land, bank deposits, and goods found in homes, churches, monasteries, and schools—and secure it under the ownership and control of the Ottoman Empire.[18] Plaintiffs allege that, in total, the Young Turks seized approximately five million Turkish gold pounds ($22,450,000 in 1915 value) from Armenians,[19] which they subsequently transferred to the German Bank Defendants.[20]

Plaintiffs assert that the German Bank Defendants accepted the gold deposits knowing that the assets had been stolen from Armenians, or seized from their bank accounts, before or after they were killed.[21] In return for the transfer of the gold deposits, the German Bank Defendants purportedly provided currency to the Young Turks for the purchase of war materiel,[22] and sent some of the Armenian gold abroad as financial security for the Young Turk leaders.[23] These activities allegedly generated enormous profits for the German Bank Defendants.[24] Plaintiffs contend that—since the end of World War I—the German Bank Defendants have actively and affirmatively concealed the existence of the accounts that held the looted assets, affirmatively misrepresented their knowledge of the accounts, and deliberately obstructed efforts to identify the accounts and transfer the assets to their rightful owners.[25]

Raffi Bakian asserts that he is the rightful heir of both his paternal and maternal grandfathers, who were victims of the Armenian Genocide. He alleges that his grandfathers' business assets and household contents were confiscated by the government of Ottoman Turkey, and that they were transferred to and deposited with the German Bank Defendants.[26] Bakian purports to represent a class of putative plaintiffs consisting of "[t]he rightful owners of looted assets forcibly taken by the government of the Ottoman Turkish Empire after 1875 and deposited with the GERMAN BANK DEFENDANTS, whose property has not been returned."[27]

### B. Allegations Regarding the Timeliness of the Class B Plaintiffs' Claims

Bakian contends that the Class B claims are not time-barred because, effective January 1, 2007, the California legislature extended the statute of limitations for actions

15.  *Id.,* ¶ 30.

16.  *Id.,* ¶ 31.

17.  *Id.*

18.  *Id.,* ¶ 32.

19.  *Id.,* ¶ 33.

20.  *Id.,* ¶ 34.

21.  *Id.*

22.  *Id.,* ¶ 36.

23.  *Id.,* ¶ 35.

24.  *Id.,* ¶ 36.

25.  *Id.,* ¶¶ 37–38.

26.  *Id.,* ¶ 11.

27.  *Id.,* ¶ 6.

seeking the recovery of "looted assets" by any "Armenian Genocide victim" or any "heir or beneficiary of an Armenian Genocide victim" who resides in California; the statute provides that such actions can be brought on or before December 31, 2016.[28] See 2006 Cal. Stats. ch. 443 (S.B.1524) (codified at CAL.CODE CIV. PROC. § 354.45). Alternatively, he pleads the following grounds for suspending the limitations bar: (1) *fraudulent concealment and/or equitable estoppel,* on the basis that defendants knew that the Young Turks had deposited assets looted from victims of the Armenian Genocide during the First World War in their institutions but actively concealed and denied the existence of such assets;[29] and (2) *equitable tolling and/or delayed discovery,* on the basis that the substantial difficulties faced by Armenians who survived the genocide made it impossible for them to file the claims asserted in the complaint in a timely fashion.[30]

## II. DISCUSSION

### A. Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988). In deciding a Rule 12(b)(6), the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989).

The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the non-moving party. *Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir. 1996); *Mier v. Owens,* 57 F.3d 747, 750 (9th Cir.1995). It need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)).

■ A complaint is properly dismissed under Rule 12(b)(6) where it is apparent on the face of the pleading that plaintiff's claims are barred by the statute of limitations. See *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir.1980); see also *Morales v. City of Los Angeles,* 214 F.3d 1151, 1153 (9th Cir.2000) ("The district court may grant a 12(b)(6) motion to dismiss on statute of limitations grounds 'only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled,'" quoting *TwoRivers v. Lewis,* 174 F.3d 987, 991 (9th Cir.1999) (internal

---

28. *Id.,* ¶ 40.

29. *Id.,* ¶¶ 41–46, 50–56.

30. *Id.* ¶¶ 47–49.

quotations omitted)). Where the dates pertinent to the running of the statute cannot be determined from the allegations of the complaint, however, the matter cannot be decided on a motion to dismiss, and defendants must raise the defense through a motion for summary judgment or at trial. See *Jablon*, 614 F.2d at 682.

## B. Whether the Class B Plaintiffs' Claims are Time–Barred[31]

As noted, in its September 11, 2006 order granting in part and denying in part defendants' motion to dismiss the original class action complaint, the court held that, assuming the California borrowing statute applied,[32] the Class B claims were time-

31. Defendants argue that before assessing the timeliness of Bakian's claims, the court must engage in a choice of law analysis. (Defendants' Memorandum of Points and Authorities in Support of Their Partial Motion To Dismiss the Amended Complaint ("Defs.' Mem.") at 11–19.) This appears to be the rule the Ninth Circuit articulated in *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir.2006) ("First, the court must decide what choice-of-law rule governs the selection of the statute of limitations. Second, the Court must apply that rule to determine which jurisdiction's limitations law applies. Third, and finally, the Court [must] determine whether plaintiffs' claims fall within the relevant limitations period"). It is undisputed that Bakian's Class B claims are time-barred under either Turkish or German law. (See Declaration of Professor M. Fadlullah Cerrahoglu in Support of Defendants' Motion To Dismiss the Amended Complaint; Declaration of Professor Dr. Burkhard Hess in Support of Defendants' Motion To Dismiss the Amended Complaint.) Because, for reasons stated *infra*, the court concludes that Bakian's Class B claims are also untimely under California law, it need not conduct a choice-of-law analysis in this case.

32. The borrowing statute applies only if an individual was a citizen of California at the time his or her cause of action accrued. See Cal. Code Civ Proc. § 361; see also *Giest v. Sequoia Ventures, Inc.*, 83 Cal.App.4th 300, 303, 99 Cal.Rptr.2d 476 (2000). In its September 11, 2006 order, the court noted that it could not determine from the allegations of the complaint whether the assets in question were looted before or after Bakian's ancestors were killed, or whether the immediate heirs of his grandfathers knew or should have known of the looting. Consequently, the court held that it could not ascertain when the cause of action had accrued and whether the borrowing statute applied. (See Sept. 11 Order at 61–62.) Defendants argue that the Class B claims *necessarily* accrued at the time

the looted assets were converted by the Ottoman Turkish Empire because the discovery rule is not applicable to conversion claims. (See Defs.' Mem. at 19–21.) Although the general rule in California is that "the statute of limitations for conversion is triggered by the act of wrongfully taking property," see *Bono v. Clark*, 103 Cal.App.4th 1409, 1433, 128 Cal.Rptr.2d 31 (2002), courts have recognized a " 'discovery rule' exception" when "the defendant in a conversion action fraudulently conceals the relevant facts or ... fails to disclose such facts in violation of his or her fiduciary duty to the plaintiff." *AmerUS Life Ins. Co. v. Bank of America, N.A.*, 143 Cal. App.4th 631, 639, 49 Cal.Rptr.3d 493 (2006). It is doubtful that defendants owed the Class B plaintiffs a fiduciary duty since they allegedly received the assets from the Ottoman Turkish government rather than from plaintiffs' ancestors, and since banks typically do not owe fiduciary duties to depositors. See, e.g., *Lawrence v. Bank of America*, 163 Cal. App.3d 431, 437, 209 Cal.Rptr. 541 (1985) ("[U]nder ordinary circumstances the relationship between a bank and its depositor is that of debtor-creditor, and is not a fiduciary one ..."). The former basis for invoking the discovery rule may be applicable, however. Plaintiffs have alleged that the German Bank Defendants actively and affirmatively concealed the existence of the accounts that held the looted assets, affirmatively misrepresented their knowledge of the accounts, and deliberately obstructed efforts to identify the accounts and transfer the assets to their rightful owners. (First Amended Class Action Complaint, ¶¶ 37–38.) If these allegations were proved, there might be a basis for applying the discovery rule exception to accrual of plaintiffs' conversion claims. This in turn could trigger application of California's borrowing statute; that Turkish authorities (as opposed to the banks) did not conceal *their* conversion of plaintiffs' assets would not be relevant.

barred under California law, and the complaint did not adequately allege a basis for tolling the limitations period or estopping defendant from asserting timeliness as a defense.[33] In their current motion, the German Bank Defendants argue that the amended complaint fails to rectify the pleading deficiencies previously noted by the court [34] They also contend that recently enacted Code of Civil Procedure § 354.45, which purports to extend the statute of limitations for claims like Bakian's, and which is cited in the amended complaint as evidence of the timeliness of the Class B claims, is unconstitutional.[35] The court addresses these arguments in reverse order.

**1. Whether the Class B Plaintiffs' Claims Are Timely Under California Code of Civil Procedure § 354.45**

After the court issued its September 11, 2006 order, the California legislature enacted Code of Civil Procedure § 354.45, which extends until December 31, 2016 the statute of limitations for, *inter alia,* looted assets claims brought by victims of the Armenian Genocide or their heirs or beneficiaries. See CAL.CIV.PROC.CODE § 354.45(b) ("Any action, including any pending action brought by an Armenian Genocide victim, or the heir or beneficiary of an Armenian Genocide victim, who resides in this state, seeking payment for, or the return of, deposited assets, or the return of looted assets, shall not be dismissed for failure to comply with the applicable statute of limitation, if the action is filed on or before December 31, 2016").[36]

33. Sept. 11 Order at 69–77.

34. Defs.' Mem. at 24–43.

35. *Id.* at 4–11.

36. Defendants contend that this statutory provision applies only if a plaintiff also satisfies the requirements of the California borrowing statute, i.e., if the plaintiff was a citizen of California at the time his cause of action accrued. See CAL.CODE CIV. PROC. § 361. (Defendants' Reply Memorandum of Points and Authorities in Further Support of Their Partial Motion To Dismiss the Amended Complaint ("Defs.' Reply") at 8–10.) Given the plain language of § 354.45, the court cannot agree. First, the statute states that its provisions control "notwithstanding any other law." It is true that in enacting a similar statute, Code of Civil Procedure § 354.3, the legislature explicitly stated that "[s]ection 361 does not apply to this section." See CAL.CODE CIV. PROC. § 354.3(b). The phrase "notwithstanding any other law," however, is unambiguous and susceptible of only one meaning. See *People v. Murphy*, 25 Cal.4th 136, 157, 105 Cal.Rptr.2d 387, 19 P.3d 1129 (2001) (holding that the Three Strikes sentencing scheme applied in addition to other sentencing enhancements because the phrase "notwithstanding any other law" was unambiguous). That the court's interpretation is correct is confirmed by other provisions in the statute. Section 354.45(a), for example, defines "Armenian Genocide victim" as "any person of Armenian or other ancestry *living in the Ottoman Empire during the period of 1890 to 1923*, inclusive, who died, was injured in person or property, was deported, or escaped to avoid persecution *during that period.*" *Id.,* § 354.45(a)(1) (emphasis added). It allows such a victim "who resides in this state and has a claim arising out of a failure of a bank to pay or turn over deposited assets, or to turn over looted assets" to "bring an action ... to recover on that claim in any court of competent jurisdiction in this state, which court shall be deemed the proper forum for that action until its completion or resolution." *Id.,* § 354.45(b) (emphasis added). As noted, the statute also extends the statute of limitations for any action brought by an "Armenian Genocide victim" seeking the return of bank deposits or looted assets to December 31, 2016. *Id.,* § 354.45(c). As these provisions demonstrate, the statute does not require that an "Armenian Genocide victim" have been a citizen of California at the time his or her claims accrued. This is implicit in the definition of "Armenian Genocide victim" ("any ... Armenian ... living in the Ottoman Empire [between] 1890 to 1923 ... who ... was injured in person or property ... during that period") as well as in the statute's specification that it applies to "reside[nts]" rather than citizens of California.

The German Bank Defendants contend that this statute is unconstitutional and that plaintiffs cannot rely on it to revive the time-barred Class B claims. Applying *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003), and *Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir.2003), the court concludes that the statute exceeds California's power to engage in foreign affairs.[37] As a

Other courts have similarly concluded that § 361 has no applicability when a statute like § 354.45 extends the limitations period for a particular class of plaintiffs "[n]otwithstanding any other provision of law." See, e.g., *Cruz v. United States*, 387 F.Supp.2d 1057, 1080 n. 16 (N.D.Cal.2005) ("[California Civil Code § 348, which provides that there is no statute of limitations for claims to recover bank deposits] would not constitute the governing law in this case if section 354.7(c) [which extends the limitations period for claims brought by Mexican braceros to recover withheld wages] were not to apply.... *[A]bsent section 354.7(c)*, the governing statute of limitations would be California's borrowing statute, which if applicable would require the Court to apply Mexico's statute of limitations because the claims arose in Mexico and all plaintiffs were citizens of Mexico when their claims arose" (citation omitted; emphasis added)).

The court also cannot accept defendants' argument that § 354.45 does not apply to plaintiffs' claims for unjust enrichment, imposition of constructive trust, money had and received, and an accounting, because these actions are not based in tort or contract. (See Defs.' Mem. at 24 n. 9 (quoting S.B. 1524 § 1(d)).) The court doubts that § 354.45 is so limited; as codified, it applies to *"[a]ny action ... seeking payment for, or the return of, deposited assets, or the return of looted assets."* See *id.* (emphasis added). Even if defendants are correct, however, the statute would apply to each of the causes of action mentioned. Unjust enrichment (i.e., restitution) and money had and received are both classified as contract claims. See 3B. Witkin, CALIFORNIA PROCEDURE: ACTIONS § 135(4thed.1997) ("Actions in quasi-contract are, for most purposes, regarded as actions on contract, i.e., they were classified at common law as actions 'ex contractu,'" citing *Philpott v. Superior Court*, 1 Cal.2d 512, 518, 36 P.2d 635 (1934), and RESTATEMENT OF RESTITUTION § 5 ("[A] statement of facts which shows that there is a right 25 to restitution coupled with a request for it is ordinarily treated ... as if it were an action upon a contract")); *Haigler v. Donnelly*, 18 Cal.2d 674, 680, 117 P.2d 331 (1941) ("The first cause of action set forth by plaintiff is one for money had and received. [I]t is established in California that an action for money had and received is ex contractu in nature, being founded upon a promise implied in law ..."). Constructive trust and accounting are remedies rather than causes of action, and are available to a plaintiff who prevails, *inter alia*, on a conversion claim. See, e.g., *Burlesci v. Petersen*, 68 Cal.App.4th 1062, 1069, 80 Cal. Rptr.2d 704 (1998) (constructive trust); *Bell v. Bank of Cal.*, 153 Cal. 234, 242–44, 94 P. 889 (1908) (accounting); see also, e.g., *Tradewinds Escrow, Inc. v. Truck Ins. Exchange*, 97 Cal.App.4th 704, 714 n. 7, 118 Cal.Rptr.2d 561 (2002) ("We point out the claims for constructive trust and accounting seek remedies, and are based upon the underlying ... claims," citing *Michaelian v. State Comp. Ins. Fund*, 50 Cal.App.4th 1093, 1114, 58 Cal. Rptr.2d 133 (1996)). Defendants recognize as much in their moving papers. (See Defs.' Mem. at 3 n. 1 ("Plaintiff's claims for constructive trust and accounting are subject to the limitations period of the underlying substantive right," citing, *inter alia*, *Embarcadero Municipal Improvement Dist. v. County of Santa Barbara*, 88 Cal.App.4th 781, 793, 107 Cal.Rptr.2d 6 (2001) ("A constructive trust is not a substantive device but merely a remedy, and an action seeking to establish a constructive trust is subject to the limitation period of the underlying substantive right")).)

**37.** Because the court finds the statute unconstitutional on this ground, it does not address defendants' additional arguments regarding constitutionality, i.e., that the statute violates due process (both by regulating transactions that have no nexus with California and by reviving stale claims) and that it violates the Commerce Clause. See *Garamendi*, 539 U.S. at 413 n. 7, 123 S.Ct. 2374 ("Because we hold that HVIRA is preempted under the foreign affairs doctrine, we have no reason to address the [Commerce Clause] question[ ]"); *Deutsch*, 324 F.3d at 702 (noting that California Code of Civil Procedure § 354.6 "reviv[ed] claims that were already time-barred" and "upset the repose of potential defen-

result, it cannot apply § 354.45 to extend the statute of limitations on plaintiffs' Class B claims.

### a. State Statutes That Conflict with Treaties or Executive Agreement Are Preempted Under the Supremacy Clause of the United States Constitution

■ The Constitution allocates "the foreign relations power" to the federal government and vests the authority to decide what the nation's foreign policy should be in the executive branch. See *Garamendi*, 539 U.S. at 413–14, 123 S.Ct. 2374. The executive has authority to enter into treaties and "executive agreements" with foreign governments,[38] including agreements that resolve the wartime claims of American citizens. *Id.* at 415, 123 S.Ct. 2374 ("Making executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice"); *Deutsch*, 324 F.3d at 713–14 ("[T]he Constitution allocates the power over foreign affairs to the federal government exclusively, and the power to make and resolve war, including the authority to resolve war claims, is central to the foreign affairs power in the constitutional design"). The power of the federal government to resolve wartime claims extends not only to claims against a foreign government itself, but also to claims against its nationals, including corporations. See *Garamendi*, 539 U.S. at 416, 123 S.Ct. 2374 ("Historically, wartime claims against even nominally private enti-

ties have become issues in international diplomacy.... [U]ntangling government policy from private initiative during wartime is often so hard that diplomatic action settling claims against private parties may well be just as essential in the aftermath of hostilities as diplomacy to settle claims against foreign governments").

■ Under the Supremacy Clause, treaties and executive agreements resolving wartime claims preempt state laws that have "more than incidental effect in conflict with [the] express foreign policy of the National Government" embodied in those agreements. *Id.* at 416–17, 420, 123 S.Ct. 2374; see also, e.g., *id.* at 421, 123 S.Ct. 2374 ("The exercise of the federal executive authority means that state law must give way where ... there is evidence of clear conflict between the policies adopted by the two"); *Pink*, 315 U.S. at 230–31, 62 S.Ct. 552 ("[S]tate law must yield when it is inconsistent with, or impairs ... the superior Federal policy evidenced by a treaty or international compact or agreement").

*Taiheiyo Cement Corp. v. Superior Court*, 117 Cal.App.4th 380, 12 Cal.Rptr.3d 32 (2004), a recent decision by the California Court of Appeals, illustrates the application of this constitutional principle. There, a United States citizen who was formerly a Korean national filed an action in Los Angeles Superior Court against a Japanese company, alleging that he had been forced to perform slave labor for the company during the Second World War. *Id.* at 386, 12 Cal.Rptr.3d 32. Plaintiff

---

dants", and thus "raise[d] serious due process questions," but declining to address the issue because the statute was invalid under the foreign affairs doctrine).

**38.** Executive agreements are international agreements entered into by the President with foreign nations without "the Advice and Consent of Senate," i.e., without strictly complying with the formalities required by the Con-

stitution's Treaty Clause. See *Weinberger v. Rossi*, 456 U.S. 25, 29–30, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) (quoting U.S. Const., art. II, § 2). The Supreme Court has recognized that the President must of necessity enter into such agreements, see, e.g., *id.* at 30 n. 6, 102 S.Ct. 1510, which are to be applied by the courts as the law of the land. *United States v. Pink*, 315 U.S. 203, 230, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

asserted that his claims were timely under California Code of Civil Procedure § 354.6. Section 354.6 authorized "slave labor victims" and "forced labor victims" to "bring an action to recover compensation for labor performed," and stated that "[a]ny action brought under this section shall not be dismissed for failure to comply with the applicable statute of limitations, if the action is commenced on or before December 31, 2010." *Id.* at 387, 12 Cal.Rptr.3d 32; see also CAL.CODE CIV. PROC. § 354.6(b),(c).

The appellate court initially held that the statute did not impermissibly infringe on the federal government's exclusive power over foreign affairs. The California Supreme Court granted review; while the matter was pending before it, the United States Supreme Court decided *Garamendi*. The California Supreme Court therefore remanded to the Court of Appeal with directions that it reconsider its decision in light of *Garamendi. Id.* at 385, 12 Cal. Rptr.3d 32.

Applying *Garamendi,* the Court of Appeal noted that federal law need not expressly preclude the action taken by the state. *Id.* at 390. Rather, the court stated, "[t]he critical inquiry is whether the federal expression of foreign policy conflicts with the state law." *Id.* Viewing the question in this light, the court concluded that § 354.6 was unconstitutional, because it "encourag[ed] coercive litigation of [wartime] claims" against Japan and its nationals, and thus "conflict[ed] with the federal policy embodied in the [Treaty of Peace between the United States and Japan that formally ended World War II ('1951 Treaty') ]," which contemplated that such claims would be resolved "diplomatically." *Id.* The court noted that the 1951 Treaty waived all Allied claims against Japan and its nationals, and recognized that the claims of non-signatory nations (like Korea) and their citizens would be resolved through separate negotiations between those governments and Japan. *Id.* at 391–92, 12 Cal.Rptr.3d 32 (noting that the 1951 Treaty "embod[ied] the federal purpose and foreign policy that WWII claims by individuals of nonsignatory nations were to be resolved through diplomacy"). The court thus concluded that, even if § 354.6 were deemed to be merely a "procedural" statute that lengthened the statute of limitations,[39] it unconstitutionally conflicted

---

**39.** In determining whether § 354.45 improperly intrudes upon the federal government's foreign affairs powers, the court need not decide whether it is a procedural or substantive statute. However characterized, the statute creates a special rule for victims of the Armenian Genocide, their heirs and beneficiaries. See *Taiheiyo Cement Corp.,* 117 Cal. App.4th at 396, 12 Cal.Rptr.3d 32 ("[I]t does not matter if section 354.6 is characterized as a legitimate procedural statute enacted within an area of traditional state competence.... [T]he express reason behind section 354.6 is to assure th[at] '[t]housands of victims of Nazi persecution, and the heirs of victims of Nazi persecution ... are given a reasonable opportunity to claim their entitlement to compensation for forced or slave labor performed prior to and during the Second World War.' This interest, while noble, conflicts with the federal policy embodied in ... the 1951 Treaty," quoting Cal. Sen. Bill No. 1245 (1999–2000 Reg. Sess.) § 1(a)-(b)); see *id.* at 394 (noting that the court had concluded in its earlier opinion that § 354.6 was procedural, but that other courts had disagreed, and stating: "[W]hether viewed as procedural or substantive, it is inescapable that section 354.6 is a special rule authorizing WWII slave and forced labor victims to sue and recover damages in California courts as a result of their enslavement during the war, a rule that conflicts with the 1951 Treaty's expression of federal policy that such war-related claims should be resolved diplomatically"); see also *Deutsch,* 324 F.3d at 708 ("The parties debate whether section 354.6 is substantive or procedural [T]hat distinction does not affect the outcome here. Our determination of the foreign affairs doctrine issue does not depend on our conclusion that section 354.6 is substantive law. Whether substantive or procedural, section 354.6 creates a special rule that applies only to a newly defined class of tort

with the federal foreign policy embodied in the 1951 Treaty. *Id.* at 394–96, 12 Cal. Rptr.3d 32.

The Ninth Circuit had earlier reached a similar conclusion regarding the constitutionality of § 354.6 in *Deutsch,* 324 F.3d at 692, which it decided before the Supreme Court's decision in *Garamendi.* The *Deutsch* court held that § 354.6 "impermissibl[y] . . . intrude[d] on the federal government's exclusive power to make and resolve war, including the procedure for resolving war claims." *Id.* at 712. The court noted that the 1951 Treaty neither created, either "explicitly or implicitly [,] a private right of action against Japan or its nationals" nor "authorize[d] states of the United States to create such a right." *Id.* at 714. "[I]n the absence of some specific action that constitutes authorization on the part of the federal government," the court observed, "states are prohibited from exercising foreign affairs powers, including modifying the federal government's resolution of war-related disputes." *Id.*; see also *id.* ("[W]ithout [explicit] authorization, states lack the power to alter the federal government's resolution of disputes relating to the [Second World War]").

The court rejected the argument of certain Korean and Chinese petitioners that their claims were not barred by the 1951 Treaty because their nations had not been parties to the agreement. It held that this was "immaterial" because, "[w]hen the United States has been a party to a war, the resolution it establishes to that war is the resolution for the whole part of the United States. States lack the power to modify that resolution, regardless of the citizenship of those seeking redress." *Id.* at 714 n. 14.

**b. Section 354.45 Conflicts with the Federal Government's Resolution of Wartime Claims Arising Out of World War I and Is Consequently Preempted**

■ Just as § 354.6 created a cause of action for victims of slave or forced labor during World War II, § 354.45 creates a cause of action for those who were victims of the Armenian Genocide that culminated during World War I, and their heirs and beneficiaries. Like § 354.6, which extended the statute of limitations on forced labor claims to 2010, § 354.45 extends the statute of limitations governing Armenian Genocide claims to 2016. The question is whether the federal government previously exercised its exclusive power to resolve claims arising out of World War I through post-war diplomacy, and thus whether the state statute impermissibly intrudes on the federal government's foreign affairs power.

The answer to this question is clearly yes. In the Claims Agreement Between the United States of America and Turkey (the "Ankara Agreement"),[40] the Republic of Turkey agreed to pay the United States a "lump sum" of $1,300,000 "in full settlement of the claims of American citizens

---

actions—actions brought by Second World War slave labor victims against the *entities* that enslaved them. This new rule profoundly alters the likelihood that such actions will succeed, by not only extending the statute of limitations for claims that were timely when the statute took effect (although we doubt that any such claims existed), but, far more important, by reviving claims that were already time-barred. . . . The important point for our foreign affairs analysis is that the California legislature created—or at least resurrected—a special class of tort actions, with the aim of *rectifying wartime wrongs committed by our enemies or by parties operating under our enemies' protection*").

40. Claims Agreement Between the United States of American and Turkey, Signed at Ankara, Oct. 25, 1934 ("Ankara Agreement"), reprinted in 2 U.S. Dep't of State, Foreign Relations of the United States, 1934: Europe, Near East and Africa at 933–34 (1934) (hereinafter "1934 State Department Report").

which are embraced by the Agreement of December 24, 1923." [41] That agreement—embodied in an exchange of notes—in turn provided that the "reciprocal claims" of American and Turkish nationals based on acts occurring during World War I would be adjudicated by a mixed claim commission.[42] Following payment of the lump sum settlement, Fred. K. Nielsen—who had been assigned to the Turkish–American Claims Commission by the President in February 1933 [43] and who executed the

Ankara Agreement on the President's behalf—submitted a report to the Secretary of State to document the process by which the settlement was reached and the manner in which it should be distributed.[44] Nielsen recognized that the "claims of persons ... considered to be persons of Turkish origin under Turkish law" were not filed with (but rather only "furnished to") the Commission, due to Turkey's refusal to recognize its liability for such claims.[45] Nielsen made clear, however, that the par-

41. *Id.* art. I, at 934.

42. See Letter from Rear Admiral Mark L. Bristol, High Commissioner at Constantinople, to Adnan Bey, the Delegate at Constantinople of the Turkish Ministry of Foreign Affairs (Dec. 24, 1923), and Letter from Adnan Bey, the Delegate at Constantinople of the Turkish Ministry of Foreign Affairs, to Rear Admiral Mark L. Bristol, High Commissioner at Constantinople (Dec. 24, 1923), reprinted in 2 U.S. Dep't of State, FOREIGN RELATIONS OF THE UNITED STATES, 1923 at 1190–91 (1923). The Agreement of December 24, 1923 provided that the mixed claim commission that was to commence "six months after the exchange of ratification of the treaty signed at Lausanne August 6, 1923, concerning the general relations between the United States and Turkey." (*Id.*) The Lausanne Treaty, however, never received Senate ratification. (See E. Russell Lutz, Current Notes, *Claims Against Turkey*, 28 AM. J. INT'L L. 346, 346 (1934).) In an exchange of notes between the United States and Turkey dated February 17, 1927, it was agreed that—in the event the Lausanne Treaty was not ratified—the Agreement of December 24, 1923 would come into force six months after the exchange and ratifications of a commercial convention and a convention of residence and establishment. (*Id.*) On October 1, 1929, the former convention was signed; ratifications were subsequently exchanged on April 22, 1930.(*Id.*) On October 28, 1931, the latter convention was signed; ratifications were subsequently exchanged on February 15, 1933.(*Id.*) The mixed claims commission established by the Agreement of December 24, 1923 thus convened in August 1933, pursuant to the February 17, 1927 exchange of notes. (See 1934 State Department Report at 901 n. 8.)

43. Lutz, *supra*, at 347.

44. See Fred. K. Nielsen, AMERICAN-TURKISH CLAIMS SETTLEMENT UNDER THE AGREEMENT OF DECEMBER 24, 1923 AND SUPPLEMENTAL AGREEMENTS BETWEEN THE UNITED STATES AND TURKEY (1937). The report was prepared pursuant to the Act of March 22, 1935, 49 Stat. 67, 76.

45. Nielsen, *supra*, at 13. In a declaration submitted in support of plaintiffs' supplemental opposition to defendants' partial motion to dismiss, plaintiffs' expert selectively cites this portion of the Nielsen report for the proposition that the claims of American citizens of Turkish origin were not settled by the Ankara Agreement. (See Declaration of Professor Cesare P.R. Romano, Ph.D., LLM ("Romano Decl."), ¶¶ 30, 32 "During the process of collective claims to be presented to the Commission, the United States Department of State received about 1,900 claims of persons whom the Department considered to be persons of Turkish origin. The names of those claimants together with those of other claimants were furnished to the members of the commission, but the Department did not file with the Commission the claims of persons considered to be of Turkish origin Because of the foregoing, it is difficult to conclude that the United States government ever entered into an agreement with Turkey to dispose of any past and future claims by United States citizens against Turkey. The only claims it would be possible to considered completely foreclosed are those adjudicated and compensated, and those considered by the Commission which were not deemed to be suitable for compensation. Certainly claims arising from the persecution of Armenians were not included ..." (footnotes omitted)).

ties intended the Ankara Agreement to be a final settlement of all such claims:

> "While ... the Commission did not consider the[ ] claims of naturalized citizens of Turkish origin [in reaching the amount of the lump sum settlement], the Agreement of October 25, 1934 concluded by the two Governments was framed to effect a final settlement of *all* outstanding claims of the nationals of each country against the other ..." [46]

Nielsen stated that Article II of the Ankara Agreement—which provides that "the Government of the Republic of Turkey will be released from liability with respect to all [claims of American citizens which are embraced by the Agreement of December 24, 1923]," and that "every [such] claim ... shall be considered and treated as finally settled" [47]—was intended to effectuate a universal settlement of all claims "in harmony with international practice in relation to such matters," as exemplified by previously executed reparations treaties that contained facially broader release and settlement clauses.[48]

Nielsen's report is reflective of the diplomatic negotiations that culminated in the execution of the Ankara Agreement. As letters exchanged by the parties prior to execution of the agreement make clear,[49] the "lump sum" settlement was in lieu of the separate adjudication of disputed claims before a mixed claims commission, and was intended to settle the wartime claims of American nationals of both Ottoman *and* non-Ottoman origin. See, e.g., Letter of Robert P. Skinner, Ambassador to Turkey, to Secretary of State Cordell Hull (Mar. 11, 1934) (stating that the United States stipulated that the claims commission "would examine in its ensemble the total list of claims without thorough examination of nationality of claimants and by common accord would propose a lump sum"), reprinted in 1934 State Department Report, *supra* note 30, at 911; Turkish Counter Proposal for a Lump Sum Settlement of American Claims Against Turkey, Transmitted in Dispatch No. 70 from Turkish Ambassador to Sec. of State (Dec. 15, 1933) ("[A] third list of 1504 petitions relates exclusively to claims presented by naturalized Americans, formerly Turkish nationals. The three above-mentioned lists comprise therefore 1880 cases representing, according to the claims of the interested parties, a grand total of 55 million dollars. To cut short all discussion and to spare both parties the trouble of a detailed examination of individual claims which would be apt to take a considerable period of time ... the American Delegation proposes to reach an understanding upon the basis of the payment by Turkey of a lump sum of five million dollars corresponding approximately to ten percent of the total claimed by the interested parties. The Turkish Delegation shares the view that it would be preferable to avoid the

---

46. Nielsen, *supra* note 43, at 15 (emphasis added).

47. Ankara Agreement, art. II, reprinted in 1934 State Department Report, *supra* note 40, at 934.

48. Nielsen, *supra* note 43, at 15. In this regard, plaintiffs' argument that the Ankara Agreement's release and settlement clause is deliberately narrower than those contained in earlier reparations treaties (see Romano Decl., ¶¶ 25–27) is belied by the historical record.

49. Case law recognizes that, " 'to ascertain the meaning of treaties, [courts] may look beyond the written word to the history of the treaty, the negotiations, and the practical construction of the parties.' " *Mitsubishi Materials Corp. v. Superior Court*, 113 Cal.App.4th 55, 61, 6 Cal.Rptr.3d 159 (2003) (quoting *Air France v. Saks*, 470 U.S. 392, 396, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985)); see also *Chan v. Korean Air Lines*, 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989) (recognizing that drafting history may be consulted to shed light on meaning of the text of a treaty).

examination of individual cases and that the payment by Turkey of a lump sum in reasonable installments could, in principle, constitute a basis of a satisfactory agreement"), reprinted in 1934 State Department Report, *supra* note 30, at 904.[50]

The conclusion that the United States resolved claims arising out of World War I with Turkey in such a manner as to foreclose the assertion of claims now by Armenian–Americans finds additional support in the Treaty of Lausanne of August 6, 1923,[51] which was separately negotiated by the United States and Turkey following the end of World War I.[52] Although the Senate failed to ratify this treaty,[53] it is noteworthy that it contained no provisions "with respect to the protection of minorities," which the United States considered "one of [a] great[ ] number of concessions" it was required to make in negotiating the agreement. See Letter from Joseph C. Grew, Representative of Special Mission at Lausanne to Secretary of State, June 21, 1923, reprinted in 2 U.S. Dep't of State, FOREIGN RELATIONS OF THE UNITED STATES, 1923: EUROPE, NEAR EAST AND AFRICA 1092 (1923); Letter from Joseph C. Grew to

Secretary of State, August 6, 1923, reprinted in 2 U.S. Dep't of State, FOREIGN RELATIONS OF THE UNITED STATES, 1923: EUROPE, NEAR EAST AND AFRICA 1148 (1923). Indeed, in attempting to secure ratification of the Treaty of Lausanne by the Senate, the State Department represented that it had deliberately chosen not to include any concrete measures regarding minority rights in the treaty because doing so would have been counterproductive to concluding an agreement. See Letter from Secretary of State to Senator Henry Cabot Lodge, May 5, 1924 (stating that, in negotiating the treaty, the United States had "avoided the advocacy of measures [safeguarding minorities] impossible of realization by methods short of war or of measures which would only be calculated to make more difficult the reaching adjustments between the Minorities and the authorities in control of the country," and noting "the traditional policy of the United States against intervention in behalf of the nationals of other countries or the assumption of treaty obligations in such matters"), reprinted in 2 U.S. Dep't of State, FOREIGN RELATIONS OF THE UNITED STATES, 1924: EUROPE, NEAR EAST AND AFRICA 715, 719–20 (1924).[54]

---

**50.** See also *Declarations Verbales* by Fred K. Nielsen on August 14, 1934 ("The Turkish Government has been notified that there are approximately 1900 claims of American citizens of Ottoman origin. The Turkish Foreign Office has through diplomatic channels informed the Government of the United States that the Turkish Government intended to exclude from the categories of American claimants persons who at the time of the injury for which they claim reparation were according to Turkish law Ottoman subjects. *It was agreed in the Committee that, in connection with the negotiations for a lump sum settlement, the legal issues involved in cases of this nature would not be discussed"* (emphasis added)), reprinted in 1934 State Department Report, *supra* note 30, at 920.

**51.** Defendants rely heavily on the Treaty of Sèvres and the Treaty of Lausanne dated July 24, 1923. They argue that a comparison of these treaties' provisions regarding the claims

of victims of the Armenian Genocide demonstrates "that deliberate decisions were made by the U.S. government and other international powers regarding the amount of reparations to be paid by Germany and its national[s] and that Armenian citizens of Turkey should not receive reparations." (Defs.' Mem at 34.) Although it participated in their negotiation, the United States was not a party to either of these agreements, and they are thus of only minimal relevance to the outcome here.

**52.** See General Treaty of the United States of America and Turkey, Aug. 6, 1923, reprinted in 18 AM. J. INTL. L. 179,231 (Supp.1923).

**53.** See *supra* note 41.

**54.** This resolution is in contrast to the Treaty of Sèvres, in the negotiation of which the United States participated. See Treaty of Peace Between the Allied and Associated

In short, the executive agreements into which the United States and Turkey entered following World War I demonstrate that the United States elected to settle the claims of victims of the Armenian Genocide through the Ankara Agreement. While California may consider the settlement the United States reached inadequate, see generally S.B. 1524, "[t]he federal government, acting under its foreign affairs authority, provided its own resolution to the war [and] California has no power to modify that resolution." *Deutsch*, 324 F.3d at 715.

The series of agreements by which the United States resolved claims arising out of World War I with Germany are to like effect. On August 25, 1921, the United States entered into a bilateral treaty with Germany (the "Treaty of Berlin"), which formally ended hostilities between the two parties.[55] On August 10, 1922, the United States and Germany entered into an executive agreement, which established a "mixed commission" to determine the

---

Powers and Turkey (Treaty of Sèvres), Aug. 10, 1920, B.T.S. No. 11 (1920), reprinted in 15 AM. J. INT'L LAW 179 (Supp.1921). This treaty required the Turkish government to return abandoned property to Armenians through the establishment of arbitral commissions. *Id.* at Ari 144. It recognized the "injustice" of the Liquidation Commissions established by "the law of 1915 relating to Abandoned Properties (Emval–i–Metroukeh), and of the supplementary provisions thereof," declaring them "null and void, in the past as in the future." *Id.* The Treaty also required the Turkish government "to facilitate to the greatest possible extent the return to their homes and re-establishment in their businesses of the Turkish subjects of non-Turkish race who ha[d] been forcibly driven from their homes by fear of massacre or any other form of pressure since January 1, 1914" and to "restore[ ] to them as soon as possible, in whatever hands it may be found" "any immovable or movable property ... which can be recovered," regardless of the claims of ownership of "the present owners or occupiers." *Id.* As noted earlier, this treaty was never ratified, and most Allied Powers subsequently entered into the Treaty of Lausanne of July 24, 1923. This agreement contained no war crimes clause, but was accompanied by a "Declaration of Amnesty" that covered all offenses committed by the Turkish regime during the war. The parties to it "reciprocally renounce[d] all pecuniary claims for the loss and damage suffered respectively by Turkey and the said Powers and by their nationals (including juridical persons) between the 1st August, 1914, and the coming into force of the present Treaty, as the result of acts of war or measures of requisition, sequestration, disposal or confiscation." See Treaty of Peace Between the Allied Powers and Turkey (Treaty of Lausanne), July 24, 1923, art. 58, 28 L.N.T.S. 11, reprinted in 18 AM. J. INT'L L. 1 (Supp.1924); see also Theodor Meron, *Reflections on the Prosecution of War Crimes by International Tribunals*, 100 AM. J. INT'L L. 551, 558 (2006) ("The Treaty of Sèvres, an initial peace agreement between the Allies and Turkey, contained provisions consistent with the recommendations of the commission on responsibility in 1919. These provisions were never implemented, however, because the treaty was never ratified. The Treaty of Lausanne, which was eventually signed by the Allies and Turkey in 1923, when Turkey was in a much stronger position, contained no war crimes clauses; instead, it was accompanied by a 'Declaration of Amnesty' that covered all offenses committed during the wartime period. Rather than insist on war crimes clauses, the Allies agreed that Turkey itself would prosecute offenders, just as the Allies had permitted Germany to try offenders in Leipzig. The so-called Istanbul trials were no more successful than the Leipzig trials: many defendants were absent, the sentences were light, and the proceedings never gained any popular support. For their part, the Turks denied that crimes against humanity had been committed against the Armenians between 1915 and 1917" (footnotes omitted)). The United States participated in the negotiation of both documents, although, as noted earlier, it ultimately was not a party to either.

**55.** Treaty of Peace Between the United States and Germany, Aug. 25, 1921 ("Treaty of Berlin"), 42 Stat.1939.

amount to be paid by Germany in satisfaction of its financial obligations under Treaty of Berlin.[56] The mixed commission was to resolve, *inter alia*, claims by American citizens for damage to their property and rights within German territory, other claims suffered by the United States or its nationals as a result of the war, and debts owed to American citizens by the German government or German nationals.[57] "[T]he whole purpose of the agreement was to ascertain how much was due from one government to the other on account of the [wartime claims] of their respective citizens," *Z. & F. Assets Realization Corp. v.*

*Hull,* 114 F.2d 464, 472 (D.C.Cir.1940), aff'd, 311 U.S. 470, 61 S.Ct. 351, 85 L.Ed. 288 (1941), and the mixed commission was the sole body established to adjudicate such claims, see, e.g., Edwin M. Borchard, *The Opinions of the Mixed Claims Commission, United States and Germany,* 19 Am. J. Int'l L. 133, 134 (1925) ("The terms of the treaty *fix and limit* Germany's obligations to pay ..." (emphasis added)). The parties agreed that "[t]he decision of the commission and those of [its] umpire ... shall be accepted as final and binding." [58] Notably, the executive agreement that created the mixed commission was

---

**56.** Agreement Between the United States and Germany for a Mixed Commission To Determine the Amount To Be Paid by Germany in Satisfaction of Germany's Financial Obligations Under the Treaty Concluded Between the Two Governments on August 25, 1921, U.S.-Germany ("Mixed Commission Agreement"), Aug. 10, 1922, 42 Stat. 2200. Congress later passed the Settlement of War Claims Act of 1928, Pub.L. No. 70–167, 45 Stat. 254, which provided a mechanism for the payment of awards rendered by the mixed claims commission.

**57.** Mixed Commission Agreement, art. I; see also Edwin M. Borchard, *The Opinions of the Mixed Claims Commission, United States and Germany,* 19 Am. J. Int'l L. 133, 134 (1925) (noting that, among the claims that were to be adjudicated by the mixed commission, were claims for "damage to 'all property wherever situated belonging to any of the [Allied or] Associated States or their nationals ...' injured, seized, or destroyed by acts of Germany or her allies, and [claims for] damage to property caused by 'any belligerent' 'directly in consequence of hostilities or of any operations of war,'" quoting Treaty of Peace Between the Allied and Associated Powers and Germany ("Treaty of Versailles"), Annex I, ¶ 9, June 28, 1919, 225 Consol. T.S. 188).

Although the United States never ratified the Treaty of Versailles, select provisions of that treaty were incorporated, *inter alia*, into the executive agreement creating the mixed commission. See Mixed Commission Agreement, preamble ("The United States of America and Germany, being desirous of determin-

ing the amount to be paid by Germany in satisfaction of Germany's financial obligations under the Treaty [of Berlin] concluded by the two Governments on August 25, 1921, which secures to the United States and its nationals rights specified under a resolution of the Congress of the United States of July 2, 1921, including rights under the Treaty of Versailles ..."). Indeed, one contemporary commentator argued that, "in spite of its actual repudiation *in toto* by the United States, the Treaty of Versailles, exclusive of the portions specified in Article 2 of the Treaty of Berlin, has in effect been implicitly accepted and ratified by the United States through the adoption of the remaining portions in the same Article and the admission by the United States of their limiting as well as concessionary application to claims supported under the Treaty in which they are comprised." Hessel E. Yntema, *The Treaties with Germany and Compensation for War Damage,* 23 Colum. L.Rev. 511, 523 (1923). The full text of paragraph 9 of Annex I reads: "Compensation may be claimed from Germany under Article 232 above in respect to the total damage under the following categories: ... Damage in respect of all property wherever situated belonging to any of the Allied or Associated States or their nationals, with the exception of naval and military works or materials, which has been carried off, seized, injured, or destroyed by the acts of Germany or her allies on land, on sea or from the air, or damage directly in consequence of hostilities or of any operations of war."

**58.** *Id.,* art. IV.

premised on the notion that American citizens would have no private right of action against Germany or its nationals. See *Z. & F. Assets Realization Corp.*, 114 F.2d at 472 ("The [executive agreement] is between the two governments; the citizens are not parties thereto; and no provision is made or contemplated therein, for submitting any question to the courts" (footnote omitted)).

Given the provisions of the Ankara Agreement, the diplomatic correspondence leading up to the execution of that agreement, and the executive agreement creating the mixed commission to address claims to be paid by Germany, the court must conclude that § 354.45 is an attempt by the California legislature to "modify" the executive's "resolution to the war" as it concerns claims against German nationals for the return of confiscated property by heirs of victims of the Armenian Genocide. *Deutsch*, 324 F.3d at 715. As noted, however, "California lacks the power to create a right of action—or, alternatively, to resurrect time-barred claims—in order to provide its own remedy for war-related injuries inflicted by out former enemies and those who operated in their territories." *Id.* at 716. As a result, under the controlling constitutional precepts articulated in *Garamendi* and *Deutsch*, the court is constrained to conclude that § 354.45 is

unconstitutional and cannot be applied to revive the Class B plaintiffs' otherwise time-barred claims, just as § 354.6 could not be applied to revive the time-barred claims of "slave laborers" that arose out of World War II. To the extent that the executive did not entirely waive plaintiffs' Class B claims through the signing of the Ankara Agreement, the federal government dictated long ago that the wartime claims of American citizens against German corporations, like the German Bank Defendants, were to be decided by the mixed claims commission. That plaintiffs did not—or could not—seek relief in that arbitral forum is immaterial; California's "dissatisfaction" with the remedial procedure established by the federal government to resolve wartime claims, no matter how well-intentioned or deeply felt, does not render constitutional its attempt to provide plaintiffs an alternate forum in the California courts.

### c. Plaintiffs' Arguments to the Contrary Are Unavailing

In supplemental briefing filed after the hearing on defendants' motion to dismiss the Class B claims, plaintiffs advanced a number of arguments to demonstrate that § 354.45 is not preempted by the Ankara Agreement and other executive agreements that ended World War I. The court finds none of these arguments persuasive.[59]

---

**59.** Several of these arguments were advanced successfully in a case pending before Judge Christina A. Snyder of this district, *Movesesian et al. v. Victoria Versicherung AG et al.*, No. CV 03–9407 CAS (Mcx). On November 5, 2007, plaintiffs filed a request for judicial notice in support of their opposition to defendants' motion to dismiss. The request asked that the court judicially notice Judge Snyder's June 7, 2007 order granting in part and denying in part defendant Munich Re's motion to dismiss plaintiffs' second amended complaint in *Movesesian*. In her order, Judge Snyder considered the effect of the executive agreement with Germany that established the "mixed commission" on a California statute

that extended the statute of limitations for claims asserted by heirs of victims of the Armenian Genocide against German companies that issued life insurance policies to their ancestors before World War I, but refused to honor those policies and pay benefits following the Armenian Genocide. Judge Snyder analyzed the executive agreement creating the "mixed commission," and concluded that the "resolution of insurance claims by 'Armenian Genocide victims' was not part of the United States' resolution of World War I [with Germany]." (*Id.* at 30.) While certain aspects of Judge Snyder's reasoning differ from the court's analysis here, ultimately her opinion does not undermine the court's conclusion

Plaintiffs argue first that the Ankara Agreement is not relevant, because their claims are against German nationals rather than against Turkey or Turkish nationals.[60] The court does not agree. As plaintiffs themselves recognize, their "Class B claims arise out of crimes committed by the Ottoman Turkish government, *and its German Bank agents*, against it[s] own citizens commencing in the 1890s and carrying on into the 1920s."[61] As a result, under *Garamendi*, the Ankara Agreement is broad enough to encompass plaintiffs' claims against German banks that operated in the Ottoman Empire during World War I, and purportedly assisted the Ottoman regime in wrongfully expropriating Armenian assets. See *Garamendi*, 539 U.S. at 416, 123 S.Ct. 2374 (noting that "wartime claims against even nominally private entities have become issues in international diplomacy" because "untangling government policy from private initiative during wartime is often so hard that

diplomatic action settling claims against private parties may well be just as essential in the aftermath of hostilities as diplomacy to settle claims against foreign governments"); see also *Steinberg v. Int'l Comm'n on Holocaust Era Ins. Claims*, 133 Cal.App.4th 689, 700–01, 34 Cal. Rptr.3d 944 (2005) ("Plaintiffs suggest that *Garamendi* is distinguishable because their class is limited to policyholders and heirs whose claims were rejected by Generali, an Italian company not subject to the executive agreements signed with Germany and Austria. The distinction is irrelevant. It is not the executive agreements themselves which dictated the result in *Garamendi*, but the policy reflected in them, a policy which extends to claims against Generali").[62]

Even if the Ankara Agreement did not encompass plaintiffs' Class B claims, however, the Treaty of Berlin would.[63] Plaintiffs argue in this regard that the Treaty of Berlin settled only the wartime claims of

---

that Code of Civil Procedure § 354.45 conflicts with the federal government's resolution of claims related to or arising out of World War I, and thus exceeds California's power to engage in foreign affairs. The *Movesesian* plaintiffs allege that, in their capacity as private entities, German insurers refused to pay life insurance benefits to heirs of Armenian Genocide victims. Here, by contrast, plaintiffs allege that the German Bank defendants received assets looted by the Young Turks regime from Armenians, and held those assets as "agents" of the regime during the Armenian Genocide. Whether or not claims arising out of this alleged expropriation were within the scope of the executive agreement between the United States and Germany (a point on which this court and Judge Snyder appear to differ), they were most certainly within the scope of the Ankara Agreement between the United States and Turkey. Consequently, Judge Snyder's order in *Movesesian* does not change the result here.

**60.** See Plaintiffs' Supplemental Memorandum of Points and Authorities in Opposition to Defendants' Motion To Dismiss Class B Plaintiffs ("Pls.' Supp. Opp.") at 15 (emphasis added).

**61.** *Id.*

**62.** The court deems it immaterial that the United States never formally declared war on Turkey. (See *id.* at 16 (arguing that the United States could not enter into any agreement with Turkey "to dispose of any past and future claims by United States citizens against Turkey" because "the two nations were never at war").) The Ankara Agreement was expressly intended to settle the claims of American nationals who suffered loss as a result of the Ottoman Empire's actions during World War I. Plaintiffs cite no authority for the proposition that the lack of a formal declaration of war restricts the federal government's authority to settle war-related claims asserted against the allies of the United States' wartime enemies.

**63.** Plaintiffs argue that the scope of the Treaty of Berlin, and of the Mixed Commission Agreement that implemented it, is too narrow to encompass their Class B claims against the German Bank Defendants. (See Romano Decl., ¶¶ 21–22.) The court does not agree. As noted, the Mixed Commission Agreement partially incorporated the Treaty of Versailles. (See Mixed Commission Agreement, art. I ("The commission shall pass upon the following categories of claims which are more par-

those who were American citizens at the time the treaty was executed, i.e., that it did not settle the claims of Turkish nationals who were later naturalized as American citizens.[64] A similar argument was considered and rejected by the Ninth Circuit in *Deutsch.* See *Deutsch,* 324 F.3d at 714 n. 14 ("It is immaterial that many of the Appellants are nationals of two nations, China and Korea, that were not signatories of the San Francisco treaty. When the United States has been a party to a war, the resolution it establishes to that war is the resolution for the whole of the United States. States lack the power to modify that resolution, regardless of the citizenship of those seeking redress"); see also *Taiheiyo Cement Corp.,* 117 Cal.App.4th at 398, 12 Cal.Rptr.3d 32 ("The fact that [plaintiff] was a Korean national when his war claim arose does not diminish the federal government's constitutional power to declare, as a matter of United States foreign policy, how his claim should be resolved.... Just like [plaintiff], th[e] Holocaust victims [in *Deutsch* ] were foreigners at the time their claims arose. Just as the Supreme Court perceived no constitutional impediment to the resolution of those claims by executive agreement, we see none where the federal determination has been made by treaty").[65] The court consequently cannot accept plaintiffs' argument that their ancestors' status as Ottoman nationals at the time of the alleged Turkish expropriations has any bearing on whether § 354.45 is preempted by the Treaty of Berlin. For the same reason, it is immaterial that the Treaty of Berlin did not establish specific mechanisms for victims of the Armenian Genocide to recover expropriated assets from the German

---

ticularly defined in the Treaty of August 25, 1921 and in the Treaty of Versailles ...").) The Treaty of Versailles provided for the settlement, *inter alia,* of "[d]amage in respect of all property wherever situated belonging to any of the Allied or Associated States or their nationals ... which has been carried off, seized, injured or destroyed by the acts of Germany or her allies ... directly in consequence of hostilities or of any operation of war," as well as "[d]amage in the form of levies, fines or other similar exactions imposed by Germany or her allies upon the civilian population." (See Treaty of Versailles, Part VIII, Annex I(9)-(10).) Even if plaintiffs' Class B claims are not encompassed by the former provision, they are surely encompassed by the latter. This conclusion is reinforced by the fact that the Treaty of Versailles expressly empowered the Reparation Commission that it established to demand that the German government seize the rights of German nationals "in any public utility undertaking or in any [other] concession operating in," *inter alia,* Turkey, and transfer such rights to the Commission. (See *id., art.* 260.)

**64.** Pls.' Supp. Opp. at 7 ("The fact that Plaintiff is now a United States citizen is entirely irrelevant. The Mixed Claims Commission (which is now defunct) was a vehicle to address World War I claims of United States citizens which arose when they were domiciled in the United States. Both the language of the Treaty of Berlin, and its actual application by the Mixed Claims Commission, amply demonstrate that it was never created to act as a forum for Ottoman Americans seeking redress against Germany").

**65.** See also *Hwang Geum Joo v. Japan,* 413 F.3d 45, 49–50 (D.C.Cir.2005) ("The appellants from China, Taiwan, and South Korea argue that because their governments were not parties to the 1951 Treaty, the waiver of claims provision in Article 14 did not extinguish their claims.... Although the appellants acknowledge that 'it may seem anomalous that aliens may sue where similar claims of U.S. nationals are waived,' they argue 'that is precisely the result contemplated by ... the [Alien Tort Statute], 28 U.S.C. § 1350.' 'Anomalous' is an understatement. See Statement of Interest of the United States at 28 ('it manifestly was not the intent of the President and Congress to preclude Americans from bringing their war-related claims against Japan ... while allowing federal or state courts to serve as a venue for the litigation of similar claims by non-U.S. nationals')" (footnote omitted, alterations original)).

Banks Defendants.[66] Cf. *id.* at 395–96, 12 Cal.Rptr.3d 32 ("[Plaintiff] seeks to distinguish *Garamendi* by contending that unlike the executive agreements at issue in that case, which provided compensation to Holocaust victims, there has been no current federal attempt to establish a similar compensation system for WWII victims of the Japanese government. [Plaintiff] misreads *Garamendi* and the 1951 Treaty. The executive agreements in *Garamendi* did not necessarily provide compensation to Holocaust victims. Indeed, as the dissent pointed out, the voluntary system encouraged by the President had yielded settlement of 'only a tiny proportion of the claims,' and the insurers' disclosure of policy information had not been 'significant.' The Court's focus in *Garamendi* was [the California statute's] conflict with the President's foreign policy embodied in the agreements encouraging the voluntary disclosure of insurance policy information and the nonadversarial settlement of insurance claims. Just as the effectiveness of the President's foreign policy was irrelevant to the *Garamendi* majority's conflict determination, it is likewise irrelevant whether the government-to-government negotiation contemplated by article 4(a) will result in satisfactory results" (citations omitted)).

Plaintiffs also contend that, even if the Ankara Agreement is applicable, their Class B claims are not among those settled by the agreement.[67] In a related vein, they assert—as a matter of historical fact—that the Armenian Genocide was not a part of World War I, and hence that their claims cannot be considered to be among those settled by an agreement whose purpose was to settle claims arising from that war.[68] The former argument is belied by the historical record. As noted, Nielsen's 1937 report to the Secretary of State and the diplomatic correspondence leading up to the execution of the Ankara Agreement make clear that the Ankara Agreement was expressly intended to settle the expropriation claims of American nationals of Ottoman origin against the Republic of Turkey. As a result, it is immaterial how contemporary historians characterize the Armenian Genocide, because it was clearly contemplated that the acts of expropriation about which plaintiffs complain would be encompassed in the settlement of war-related claims included in the Ankara Agreement. Cf., e.g., *Taiheiyo Cement Corp.*, 117 Cal.App.4th at 387 n. 5, 12 Cal.Rptr.3d 32 (holding that the California "slave labor victim" and "forced labor victim" statute—which covered the time period of 1929 to 1945—was preempted by the federal government's settlement of claims against Japan arising from World War II, even though the United States did not formally enter the war until the bombing of Pearl Harbor in December 1941).[69]

---

**66.** See Pls.' Supp. Opp. at 6 ("The important distinction with *Garamendi*, where a laundry list of forums and procedures for Holocaust claims against the German government existed prior to the California statute, is that in the instant case no such agreement addressing reparations be paid to Ottoman Citizens by harm inflicted by the German government has ever existed").

**67.** *Id.* at 16–17.

**68.** *Id.* at 8, 13–14.

**69.** In addition, the complaint alleges that the German Bank Defendants' purported partic-

ipation in the Armenian Genocide commenced only after the Young Turks' establishment of the Liquidation Commissions in 1916. (See First Amended Class Action Complaint, ¶¶ 30–34.) As a result, even if the roots of the Armenian Genocide were planted before War World I commenced, the German Bank Defendants' participation in the allegedly wrongful acts of the Turkish regime occurred only during the course of the war, purportedly in ways that assisted the Ottoman Empire in the hostilities, e.g., by providing currency to the Young Turks for the purchase of war *materiel* (*id.*, ¶ 36) and by sending Armenian assets

Plaintiffs' final two arguments are equally unavailing. Plaintiffs assert that § 354.45 is a procedural rather than a substantive statute, and thus is not preempted by the executive agreements into which the federal government entered at the end of World War I.[70] As noted, this argument was squarely considered and rejected by both the Ninth Circuit in *Deustch* and the California Court of Appeals in *Taiheiyo Cement Corp.*[71] Plaintiffs also cite *Alperin v. Vatican Bank*, 410 F.3d 532, 538 (9th Cir.2005), for the proposition that "state-created property claims for looted and plundered property that arose during World War II are actionable."[72] Presumably, plaintiffs assert that the same should be true of "state-created property claims for looted and plundered property" that arose during World War I. Plaintiffs' reliance on *Alperin* is misplaced, however, as that decision addressed the political question doctrine, and did not consider the constitutionality of a state statute that conflicts with the federal government's settlement of wartime claims. See *Alperin*, 410 F.3d at 541 n. 4 ("The viability of the Holocaust Survivors' claims apart from the issue of the political question doctrine is not before us. Nevertheless, looking ahead, we note that the statutory grounds on which the Holocaust Survivors base their claims have, for the most part, not fared well in recent litigation.... In [*Deutsch*], we held that a California stat-

ute on which the Holocaust Survivors' claims are based in part, Cal.Civ.Proc. Code § 354.6, unconstitutionally intruded on the foreign affairs power of the federal government. We leave the district court to determine in the first instance to what extent the Holocaust Survivors have correctly invoked these and other jurisdictional bases"). Stated differently—and contrary to plaintiffs' assertion—*Alperin* did *not* categorically hold that state-created property claims for looted and plundered property that arose during World War II are "actionable."

#### d. Conclusion Regarding § 354.45

For the foregoing reasons, the court finds that § 354.45 unconstitutionally intrudes on the federal government's power to conduct foreign affairs. Having concluded that the Class B plaintiffs cannot rely on § 354.45 to show that their claims are timely, the court must next evaluate whether they have adequately alleged the tolling of the limitations periods otherwise applicable to their claims, or facts indicating defendants should be estopped to assert the statute of limitations as a defense.

### 2. Whether the Statute of Limitations on the Class B Plaintiffs' Claims Was Tolled or Whether Defendants Should Be Estopped to Assert It

Defendants argue that plaintiffs' Class B claims[73] must be dismissed because the

---

abroad as financial security for Young Turk leaders (*id.*, ¶ 35).

**70.** Pls.' Supp. Opp. at 8–10 ("Another important distinction [between § 354.45 and § 354.6, the statutory provision at issue in *Deutsch*] is that section 354.45 does not intend to create a cause of action that until now did not exist.... The language of Section 354.6 creates a whole new right, not based on an existing claim, or arising out of an existing tort").

**71.** See *supra* note 39.

**72.** Pls.' Supp. Opp. at 14 n. 12.

**73.** The longest limitations period applicable to the Class B plaintiffs' claims is the four year statute that governs plaintiffs' breach of special duty claim. See *David Welch Co. v. Erskine & Tulley*, 203 Cal.App.3d 884, 893, 250 Cal.Rptr. 339 (1988) ("[W]here a cause of action is based on a defendant's breach of its fiduciary duties, the four-year catchall statute set forth in Code of Civil Procedure section 343 applies"); cf. *New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co.*, 7 Cal. App.4th 1088, 1095–96, 9 Cal.Rptr.2d 469 (1992) (noting that although an insurer is not a true fiduciary, "special duties" are imposed on it because its relationship 17 with the

amended complaint fails to rectify the pleading deficiencies noted in the court's September 11, 2006 order. Specifically, they assert that plaintiffs have again failed to plead facts supporting their claims that they did not discover defendants' tortious conduct until recently, that the statute of limitations was tolled, and/or that defendants are guilty of fraudulent concealment and estopped to rely on a limitations defense as a consequence.[74]

### a. Fraudulent Concealment/Equitable Estoppel

"Equitable estoppel, also termed fraudulent concealment, halts the statute of limitations when there is active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time." *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir.2006) (internal quotations omitted). "In order to establish fraudulent concealment, the complaint must show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Baker v. Beech Aircraft Corp.*, 39 Cal. App.3d 315, 321, 114 Cal.Rptr. 171 (1974). A defendant's "[s]ilence or passive conduct . . . is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure"; however, "[t]he affirmative act of denying wrongdoing may constitute fraudulent concealment where the circumstances make the plaintiff's reliance upon the denial reasonable." *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978).

"Under either California or federal authority, the plaintiff must plead with particularity the facts which give rise to the claim of fraudulent concealment." *Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 120 (9th Cir.1980); accord *Guerrero*, 442 F.3d at 707 ("The plaintiff must demonstrate that he relied on the defendant's misconduct in failing to file in a timely manner and must plead *with particularity* the facts which give rise to the claim of fraudulent concealment" (emphasis added)); *Baker*, 39 Cal.App.3d at 321,

---

insured is "akin to a fiduciary relationship" (internal quotations omitted)). The remaining causes of action are governed by three or two year statutes. See, e.g., *Franck v. J.J. Sugarman–Rudolph Co.*, 40 Cal.2d 81, 90, 251 P.2d 949 (1952) (a two-year limitations period governs actions for money had and received); *Butcher v. Truck Ins. Exchange*, 77 Cal. App.4th 1442, 1467–1470, 92 Cal.Rptr.2d 521 (2000) (applying § 339, *inter alia*, to a claim for negligent failure to procure insurance); *Strasberg v. Odyssey Group, Inc.*, 51 Cal. App.4th 906, 915, 59 Cal.Rptr.2d 474 (1996) (statute of limitations on conversion is three years under Code of Civil Procedure § 338(c)); *Russell Taylor's Fire Prevention Service, Inc. v. Coca Cola Bottling*, 99 Cal. App.3d 711, 721 n. 5, 160 Cal.Rptr. 411 (1979) (the statute of limitations for an unjust enrichment claim is two years under § 339(1)).

74. See Defs.' Mem. at 4–11. It is possible, although unlikely, that plaintiffs also attempt to invoke the continuing violations doctrine in their amended complaint. (See First Amended Class Action Complaint, ¶ 54 ("By virtue of the GERMAN BANK DEFENDANTS' actions to conceal the existence of the deposited assets and looted assets, and their activities in concealing their common scheme and purpose of denying, blocking and obstructing access and knowledge of these assets, *which activities are continuing in nature*, the applicable statute of limitations for all of the claims set forth in this Complaint have been tolled").) Plaintiffs have included no new allegations that would support application of the continuing violations doctrine. As a result, to the extent plaintiffs seek to rely on the doctrine, the court finds the pleading inadequate for the reasons stated in its September 11, 2006 order. (See Sept. 11 Order at 72–75.)

114 Cal.Rptr. 171 (" 'The existence of such fraud [giving rise to equitable estoppel] must be alleged clearly and unequivocally and must not rest upon inference,' " quoting *Bank of America v. Williams*, 89 Cal. App.2d 21, 25, 200 P.2d 151(1948)).

■ The amended complaint, like its predecessor, does not sufficiently plead fraudulent concealment. Plaintiffs contend that Armenian Genocide victims were displaced and struggled for decades to start a new life and achieve financial stability, and that these circumstances prevented them from making timely inquiry regarding the missing assets.[75] They assert that numerous victims nonetheless asked defendants where their assets were,[76] and that, in addition, many of their heirs purportedly sought information from consulates and other governmental agencies regarding the property and assets that had been taken from their ancestors.[77]

Plaintiffs assert that defendants had actual knowledge that the Young Turks deposited with them assets looted from victims of the Armenian Genocide during the First World War, and that they actively concealed and denied the existence of such assets, e.g., by "den[ying] all inquiries by Armenians regarding their assets and/or ... claim[ing] that they were unable to discover whether looted assets had once been in their possession."[78] They contend that defendants' misrepresentations dissuaded heirs of Armenian Genocide victims from pursuing claims against the banks to recover the assets.[79]

While these allegations may explain, in general, why some victims of the Armenian Genocide did not file timely claims to recover looted assets, they do not demonstrate when Bakian discovered defendants' purported fraud, or why he was diligent in not learning of it sooner. Bakian does not allege that he or his ancestors asked defendants to provide information concerning the missing assets. Nor does he assert that he was personally deceived by any defendant's statements or representations. Similarly, Bakian provides no information as to where his ancestors settled, or for what period of time they were financially insecure or unable to pursue these claims.

---

**75.** First Amended Class Action Complaint, ¶ 48.

**76.** *Id.*, ¶ 43.

**77.** *Id.*, ¶ 50.

**78.** *Id.*, ¶¶ 41–46. Plaintiffs allege that defendants' Rule 26 initial disclosures and production of documents in response to discovery requests indicate that they have documentation regarding the assets of Armenian Genocide victims. (*Id.*, ¶¶ 52–53.) While defendants' Rule 26 disclosures and discovery responses may be evidence that they misrepresented the facts in their possession concerning the assets of Armenian Genocide victims, they do not show when Bakian discovered defendants' alleged fraud; the circumstances under which he discovered it; or why he was not at fault for failing to discover it sooner. See *Baker*, 39 Cal.App.3d at 321, 114 Cal.Rptr. 171.

Under Rule 11 of the Federal Rules of Civil Procedure, Bakian had to have a reasonable factual basis for asserting looted asset claims before filing the complaint. His amended pleading does not explain how he developed that reasonable factual basis, when he first came into possession of facts regarding the claims, why his investigation of the claims was diligent, whether he or other family members asked defendants if they possessed assets that had once belonged to his ancestors, and whether defendants attempted to conceal their involvement in the looting of his family's assets from him. Because Bakian must have had some basis for asserting the claims *before* he filed suit, defendants' post-filing litigation conduct does not establish that they prevented Bakian from initiating this action at an earlier time, or that he acted diligently in asserting his claims.

**79.** *Id.*, ¶ 51.

In short, while the amended complaint alleges that defendants concealed the fact that they had the looted assets in their possession from *some* victims of the Armenian Genocide, it does not adequately explain why Bakian waited so long to file suit. Cf. *Rutledge*, 576 F.2d at 250 ("The sole averments in the ... complaint directed to the fraudulent concealment argument are as follows: 'Defendant has fraudulently concealed the existence of the aforesaid price discrimination through the adoption of elaborate schemes, resorting to secrecy to avoid detection, and by denying that such discrimination or price differential existed.' The only averment that is not conclusory is the allegation that defendant denied that such discrimination or price differential existed. [Plaintiff] cannot rely upon conclusory statements to avoid the bar of limitations. He must plead with particularity the circumstances surrounding the concealment and state facts showing his due diligence in trying to uncover the facts" (citations omitted)).

To the extent that Bakian asserts that defendants are estopped to assert the statute of limitations because they fraudulently concealed the basis for the claims from plaintiffs, therefore, his allegations are deficient under Rule 12(b)(6).

### b. Delayed Discovery/Equitable Tolling[80]

■ The discovery rule is not a tolling theory per se. Rather than suspending the statute of limitations, it postpones

the date on which a cause of action accrues until plaintiff "suspects or should suspect that [his] injury was caused by wrongdoing, [i.e.,] that someone has done something wrong to [him]." *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110, 245 Cal.Rptr. 658, 751 P.2d 923(1988). A plaintiff whose complaint shows on its face that his claim would be time-barred absent application of the discovery rule "must plead that, despite diligent investigation of the circumstances of the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." *Fox v. Ethicon Endo–Surgery, Inc.*, 35 Cal.4th 797, 808, 27 Cal.Rptr.3d 661, 110 P.3d 914 (2005). In other words, plaintiff must plead specific facts showing "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1120 (9th Cir.1994) (quoting *Saliter v. Pierce Bros. Mortuaries*, 81 Cal.App.3d 292, 146 Cal. Rptr. 271 (1978)). Conclusory allegations of diligence are insufficient. *McKelvey v. Boeing N. Am., Inc.*, 74 Cal.App.4th 151, 160, 86 Cal.Rptr.2d 645 (1999) (citing *CAMSI IV v. Hunter Tech. Corp.*, 230 Cal.App.3d 1525, 1536–37, 282 Cal.Rptr. 80 (1991), and *Mangini v. Aerojet–General Corp.*, 230 Cal.App.3d 1125, 1150–51, 281 Cal.Rptr. 827 (1991)).

■ Bakian alleges that the statute of limitations has not yet begun to run on his looted assets claims because the substan-

---

**80.** Although the complaint references "tolling" (*id.*, ¶ 54) a close reading of the allegations indicates that the theory on which Bakian relies is the delayed discovery rule. To the extent Bakian seeks invoke equitable tolling, his allegations are inadequate, as he does not plead that he filed a judicial action or administrative proceeding within the statutory period that alerted defendants to the existence of the looted assets claims. Under California law, which plaintiffs contend is applicable,

this is a necessary prerequisite to application of the doctrine of equitable tolling. See, e.g., *Collier v. City of Pasadena*, 142 Cal.App.3d 917, 924, 191 Cal.Rptr. 681 (1983) (noting that the first element of equitable tolling requires that a "first claim must have been filed within the statutory period" that "alert[ed] the defendant in the second [action] of the need to begin investigating the facts which form the basis of the second claim").

tial difficulties that faced survivors of the Armenian Genocide made it impossible for them to discover the underlying facts and pursue claims in a timely fashion.[81] This conclusory allegation does not adequately plead delayed discovery. While his ancestors may have faced considerable difficulties pursuing their looted asset claims,[82] Bakian fails to allege specific facts showing that these difficulties continued up to the filing of this action, such that it was reasonable for him to have waited to pursue the claims. Rather than pleading facts that would support a finding of reasonable diligence, Bakian alleges only that he is "without any fault or want of diligence or due care" in pursing the claims. The pleading provides no information as to when or how Bakian (or his parents) first discovered the facts underlying the looted asset claims, nor when he (or his parents) were first in a position, despite the lasting impact of the Armenian Genocide on their "[lives] and financial stability," to assert such claims against defendants. Additionally, Bakian does not allege any facts regarding the steps he (or his ancestors) took to discover the claims, such that his (or their) diligence can be assessed.

To the extent, therefore, that the amended complaint relies on the delayed discovery rule to render the claims timely, it is deficient under Rule 12(b)(6). Cf. *In re African–American Slave Descendants Litig.*, 375 F.Supp.2d 721, 779 (N.D.Ill. 2005) ("It is true that because of the institution of slavery, the Jim Crow laws, and the lingering bigotries and separatist views following the Civil War, African–Americans were obstructed from obtaining necessary information on their claims and in some instances access to the legal system. Nevertheless, Plaintiffs' ancestors knew of their injury at the time that it occurred. They knew, or should have known, that they were wrongfully being forced to work without compensation, and that somebody was making a profit from their labor. Yet, neither Plaintiffs nor their ancestors ever asserted these claims in a court of law until now. Plaintiffs have not shown that they acted with all due diligence in attempting to obtain vital information about their claims, and assert them timely").

## III. CONCLUSION

For the reasons stated, defendants' motion to dismiss the looted assets (Class B) claims is granted. Because the court is not yet convinced that Bakian can plead no set of facts that would entitle him to relief on the claims, it once again grants leave to amend the looted assets claims. The court notes that Bakian has already had two opportunities to plead facts that would

---

**81.** Specifically, plaintiffs avers:

"[A]s a consequence of the Armenian Genocide, Plaintiffs' relatives who survived the Armenian Genocide were stripped of their citizenship and deprived of the ability to pursue claims against the GERMAN BANK DEFENDANTS in Turkey.

Following the Armenian Genocide, survivors were displaced and without access to information about their family belongings and had no knowledge of what happened to their properties. Most survivors struggled for decades to start a new life and recreate financial stability. The Turkish government systematically exiled (by way or murder, beatings, harassment, etc.) Armenian survivors from the Ottoman Empire and prevented Armenians from ever returning to the Ottoman Empire.

Plaintiffs are without any fault or want of diligence or due care on the part of Plaintiffs essential to pursue the claims alleged herein." (*Id.*, ¶¶ 47–49.)

**82.** Although Bakian asserts that many victims of the Armenian Genocide were displaced and prevented from returning to their homes in the Ottoman Empire, he does not specifically allege that *his* ancestors were unable to return, or that they struggled for decades to achieve financial stability and thus could not pursue looted assets claims against defendants.

permit him to invoke the delayed discovery rule and/or adequately plead that defendants are estopped to rely on the statute of limitations as a defense to the claims. Bakian is cautioned that, if defendants challenge his pleading of these matters in a future motion to dismiss, and the court concludes that his allegations are insufficient, the claims will be dismissed with prejudice. Bakian may file an amended complaint within **twenty days** of the date of this order. Defendants are directed to file an answer or motion to dismiss within **twenty days** thereafter. No continuances of these dates will be granted. The only issue defendants may raise in a new motion to dismiss is the adequacy of Bakian's pleading of delayed discovery and/or fraudulent concealment.

Once the pleadings are fixed, the court will issue a minute order modifying the scheduling order, and setting a briefing schedule for, and hearing on, plaintiffs' motion for class certification.